349 F.2d 122
 CONTINENTAL BAKING COMPANY, a Delaware corporation, Appellant,
v.
UTAH PIE COMPANY, a Utah corporation, Appellee.
CARNATION COMPANY, a Delaware corporation, Appellant,
v.
UTAH PIE COMPANY, a Utah corporation, Appellee.
PET MILK COMPANY, a Delaware corporation, Appellant,
v.
UTAH PIE COMPANY, a Utah corporation, Appellee.
 No. 7306.
 No. 7308.
 No. 7309.
 United States Court of Appeals Tenth Circuit.
 May 25, 1965.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED John H. Schafer, Washington, D. C. (A. Pratt Kesler, Salt Lake City, Utah, Roy M. Anderson and Gordon A. Thomas, Rye, N. Y., Welborn & Dufford, Denver, Colo., Robert J. Muth, Covington & Burling, Washington, D. C., of counsel, on the briefs), for appellant Continental Baking Co.
 Peter W. Billings, Salt Lake City, Utah (G. Kenneth Handley, Jr., Salt Lake City, Utah, and James R. Baird, Jr., Los Angeles, Cal., of counsel, on the briefs), for appellant Carnation Co.
 George P. Lamb, Washington, D. C. (Lee, Toomey & Kent and Carrington Shields, Washington, D. C., Gene Mayfield, St. Louis, Mo., Paul Thatcher, Ogden, Utah, of counsel, on the briefs), for appellant Pet Milk Co.
 Joseph L. Alioto and Matthew P. Mitchell, San Francisco, Cal. (G. Joseph Bertain, Jr., San Francisco, Cal., Robert W. Hughes, Salt Lake City, Utah, and Maxwell M. Blecher, San Francisco, Cal., of counsel, on the briefs), for appellee Utah Pie Co.
 Before MURRAH, PHILLIPS and LEWIS, Circuit Judges.
 PHILLIPS, Circuit Judge.
 
 
 1
 Utah Pie Company[1] brought this action against Continental Baking Company,[2] Carnation Company,[3] and Pet Milk Company[4] under Title 15 U.S.C. (1958 Ed.) §§ 15 and 26.
 
 
 2
 The complaint charged that Continental, Carnation and Pet entered into a combination and conspiracy to restrain interstate commerce and monopolize such commerce in violation of §§ 1 and 2 of the Sherman Act (15 U.S.C.A. §§ 1 and 2), to be effected by destroying the competition of Utah Pie through the weakening of its capital structure and the destruction of its profits, and to violate § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act (15 U.S.C.A. § 13(a)), by price discriminations in the State of Utah, effected by selling their frozen pies at prices "below cost" in the State of Utah and at lower prices in such state than they charged for their frozen pies "in other western states."[5]
 
 
 3
 The case came on for trial in February, 1963. At the close of the evidence, each defendant properly moved for a directed verdict in its favor on the § 2(a) claims asserted by Utah Pie. Each motion was denied.
 
 
 4
 The jury returned a verdict in favor of the defendants on the conspiracy claim and a verdict against each defendant on Utah Pie's § 2(a) claims. Each defendant, in accordance with Rule 50(b) of the Federal Rules of Civil Procedure, made a timely and proper motion to set aside the verdict against it and enter judgment n. o. v. in its favor on Utah Pie's § 2(a) claims. Each motion was denied.
 
 
 5
 The jury also returned a verdict in favor of Continental on a counterclaim asserted by it, charging a § 2(a) violation by Utah Pie. On Utah Pie's n. o. v. motion, the court set aside that verdict and entered judgment on the counterclaim in favor of Utah Pie, notwithstanding it had not moved for a directed verdict in its favor on the counterclaim.
 
 
 6
 On February 23, 1963, a judgment was entered for Utah Pie against each defendant for treble the amount of the verdict against it, and permanently enjoining each of the defendants from violating § 2(a). Appeals from each of such judgments have been taken. The injunction portion of the judgment was stayed by this court, by order entered March 21, 1963.
 
 
 7
 The § 2(a) claims and the conspiracy claim were tried at the same time and the evidence in support of them was commingled. Certain facts, if set out and considered in isolation, would present a distorted picture of these cases. To get a true perspective of them, the whole factual picture and the relation of each of the facts to each other must be brought into proper focus and considered together.
 
 
 8
 In each appeal, except Continental's appeal from the judgment in favor of Utah Pie on Continental's counterclaim, there is set up as a ground for reversal that the evidence was insufficient to support the verdict in favor of Utah Pie, or warrant the injunction. Since we conclude the judgments in favor of Utah Pie must be reversed on that ground, we shall not consider the other grounds urged for reversal.
 
 
 9
 Many of the facts relating to the § 2(a) claims are pertinent in all of the appeals, and we will undertake to set out a portion of such facts in a general statement of facts. We will then set out separately the facts particularly applicable in each of the respective appeals.
 
 * General Statement of Facts
 
 10
 The evidence in these cases covers the period 1958 to 1961, both inclusive. It is free from substantial dispute, except for a few statements of opinions or conclusions not based on any substantial underlying proof.
 
 
 11
 The offering prices, selling prices, sales volumes, percentages of market shares, earnings, and other like matters; the tables and charts which appear in this opinion; and the appendices annexed hereto are all based on uncontroverted documentary evidence, some of which was introduced by the plaintiff and some by the defendants.
 
 
 12
 The phrase "frozen fruit pies" is sometimes used in the frozen pie industry in a broad sense and as including frozen apple, cherry, boysenberry, peach, pumpkin and mince pies, although the latter two are not, strictly speaking, fruit pies. In its broad sense, the phrase does not enbrace frozen cream pies, such as lemon cream, chocolate cream, cocoanut cream, and the like.
 
 
 13
 The frozen pies involved in these appeals are those embraced in the phrase "frozen fruit pies" in its broad sense.[6] We will hereafter refer to them simply as "frozen pies."
 
 
 14
 The phrase "frozen fruit pies" is also used in a more narrow sense, as embracing only the strictly fruit pies, and not including mince, pumpkin, or the cream pies. Frozen fruit pies in that narrow sense will be referred to hereinafter as "frozen fruit pies." Utah Pie, a Utah corporation, owned and operated by the Rigby family, was in the fresh pie business for nearly 30 years prior to 1957. It marketed its fresh pies in Salt Lake City and other points in Utah, in Las Vegas, Nevada, Grand Junction, Colorado, Farmington, New Mexico, Evanston, Wyoming, and at one other city in Nevada.
 
 
 15
 Faced with a declining volume and a substantial loss in its fiscal year ended October 31, 1957, Utah Pie, in the latter part of that year, entered into the frozen pie business.
 
 
 16
 It had much of the facilities needed for the frozen pie business in its old plant. It opened a new plant in 1958, which had a capacity, at least by 1961, on a three-shift basis, of 40,000 frozen pies a day, or about one and one-half million cases of frozen pies per year. There are six pies in a case. It had adequate refrigeration for fruit, production facilities, and storage of frozen pies. Its frozen pie business was well managed and its sales and transportation costs were low. It had the only frozen pie plant located in the Salt Lake City market, which enabled it to deliver to its customers frozen pies in small quantities.
 
 
 17
 The frozen pie business is comparatively new and highly competitive.
 
 
 18
 The six western states of California, Washington, Oregon, Utah, Arizona and Colorado embrace a portion of the Inter-Rocky Mountain and West Coast regions. In each of such states there are one or more separate and distinct frozen pie market areas, which comprise a large metropolitan center and the territory closely adjacent thereto. There are distinct frozen pie market areas in Los Angeles, San Francisco, Seattle, Portland, Spokane, Salt Lake City, Phoenix and Denver. The periphery of each of such market areas is nearly the same as that of the area in which its metropolitan newspapers circulate, that, because retail advertising is the lifeblood of the frozen pie industry and crucial to volume sales. The current retail price in a particular market area at a particular time is generally fixed by the prices at which the chain stores and cooperative grocery organizations advertise their frozen pies in the Thursday and Friday editions of the local newspapers, published and circulated in that market area.
 
 
 19
 During the period 1958 to 1961, inclusive, retailers of frozen pies in the Salt Lake City market advertised Utah Pie's brands a great many more times than they did brands of each of the other manufacturers selling in that market.[7]
 
 
 20
 The manufacturers and distributors of national brands, who sell throughout the United States, the manufacturers and distributors of regional brands, who sell in several of such local market areas, and sometimes a local manufacturer and distributor, whose single plant is located in a particular market area where his principal business is done, but who also may sell in other market areas in the same region, usually make up the group competing in a local market area. More than 30 different brands are sold in the six western states referred to above, and the number of nation-wide manufacturers of frozen pies is over 200.
 
 
 21
 The brands, or labels, used by the parties to these appeals were as follows:
 
 
 22
 Utah Pie "Utah," "Frost `N'
 Flame," "Mayfresh,"
 and "Sonny Boy";
 Carnation "Simple Simon";
 Continental "Morton's";
 Pet "Pet-Ritz" and "Swiss
 Miss."
 
 
 23
 Utah Pie and Pet also manufactured frozen pies for Safeway Stores, Inc.,[8] under the latter's label, "Bel-air."
 
 
 24
 The price in a particular market area depends on the number and identity of the competing manufacturers, the competitive factors in such market, and the extent of the thrust or pressure of such factors at a particular time. A local manufacturer and seller, with his plant located in a particular market area, because of his low distribution and selling costs, preferences normally given to a local business, and his ability to sell and distribute frozen pies in either large or small quantities, is in a position to assert a very substantial competitive thrust and pressure, not present where there is no local manufacturer and seller competing in the area. Another competitive factor, which affects some local market area prices is the presence of private or controlled brands of frozen pies, which are usually sold by large retail chains and members of cooperative grocery organizations, and are purchased by them in large quantities at preferential prices. A controlled label is owned by the manufacturer, but sold to only one buyer in a particular market. A private brand is owned by the buyer and may be manufactured by one or more suppliers.
 
 
 25
 Because the competitive thrusts and pressures in a particular market area differ substantially from those at a given time in other market areas and change from time to time in the several market areas, the prices in each market area change from time to time independently of price changes in other market areas. Hence, the prices in the several market areas in such Intermountain and West Coast regions have little, if any, relation to each other and are not uniform. They vary from time to time and from market area to market area.
 
 
 26
 The Salt Lake City market area[9] comprises most of the State of Utah, southern Idaho, and small areas adjacent to Utah in the States of Wyoming, Colorado and Nevada. That market developed its own competitive pattern. No brand seemed to enjoy a consumer's loyalty, with the possible exception of Utah Pie's Utah brand. Pies were purchased primarily on a price basis. The prevailing retail price was fixed by the advertised week end specials appearing in the local newspaper advertisements of the grocers on Thursday and Friday.
 
 
 27
 In the first part of 1958, Utah Pie marketed its frozen pies in Utah and Idaho. It gradually extended its sales to other areas, so that by 1961 it was selling frozen pies in Utah, Idaho, Washington, Colorado and Wyoming. However, its sales outside of Utah and southern Idaho during the period involved in this law suit, 1958 to 1961, were negligible. See Appendix I attached hereto.
 
 
 28
 Utah Pie entered the field, as stated above, late in 1957, at least two years after Carnation, Continental and other manufacturers had introduced frozen fruit pies in the Salt Lake City market. Throughout the period here involved, Utah Pie's competitive emphasis was on price and except for a comparatively few instances, hereinafter noted, it sold its frozen pies at prices below those of its competitors.
 
 
 29
 In 1958, Utah Pie sold 75,939 cases[10] of frozen pies; in 1959, 76,744 cases; in 1960, 167,788 cases; and in 1961, 205,380 cases. During those four years its volume increased 270.5 per cent and its dollar volume in sales of frozen pies increased from $139,306.24 in the fiscal year ended October 31, 1958, to $407,841.25 in the fiscal year ended October 31, 1961, an increase of 292.8 per cent. Salaries paid the Rigby family engaged in the business increased by approximately $30,000 during those four years and net income before taxes, as adjusted, went from a loss of $1,264.51 in fiscal 1958 to a profit in fiscal 1961, before taxes, of $30,597.10. After taxes, it was $19,643.04, which was 28.5 percent of its net worth.
 
 
 30
 In 1958, Utah Pie captured 66.5 per cent of the market. In 1959, while its volume increased, its share of the rapidly expanding market decreased to 34.3 per cent. In 1960, its sales volume more than doubled and its market share went up to 45.5 per cent. In 1961, its sales volume very substantially increased, as shown above, and its market share held at 45.3 per cent.
 
 
 31
 During the entire period involved in these cases, Utah Pie's sales volume and dollar sales substantially increased as did its profits except in 1958, and it enjoyed a very large percentage of the total sales volume in the Salt Lake City market, which percentage stabilized at about 45 per cent the last two years of the period. Throughout such period it was continuously a financially strong business concern and a healthy and effective competitor in the Salt Lake City market.
 
 
 32
 Utah Pie's phenomenal increase in sales of frozen fruit pies, an increase of 270.5 per cent in four years, came notwithstanding its sales efforts were almost minimal. Utah had but one salesman in the nine states in which it attempted to sell frozen fruit pies during the years 1958 to 1961. This salesman made only isolated trips to cities outside Utah Pie's immediate trading area, the Salt Lake City market. The company maintained no permanent sales force in such cities as Spokane, Seattle and Denver. It once had a broker in Portland, but apparently for only a short time. It made an effort to secure the account of Miller's Supermarket in Denver, but the Utah Pie salesman was told he would have to contact the chain's office in Chicago. No contact was ever made. The amounts spent on advertising during the years 1957 to 1961, inclusive, were comparatively small, and were as follows:
 
 
 33
 In fiscal 1957 $ 432.21
 1958 3,431.71
 1959 3,180.29
 1960 7,160.63
 1961 1,226.01
 
 
 34
 As will appear from the table which follows, the demand for frozen pies in the Salt Lake City market rapidly increased during the period 1958 to 1961, inclusive.
 
 
 35
 The following table is a composite picture of the total sales volume and the percentage of market shares of each party hereto and the other competitors in the Salt Lake City market in the years 1958 to 1961, inclusive.
 
 
 36
 1958 (Volume in dozens)

 % of
 Company Volume Market
 Carnation 5,863 10.3
 Morton 754 1.3
 Utah Pie 37,969.5 66.5
 Pet 9,336.5 16.4
 Others 3,137 5.5
 ________ _____
 Totals 57,060 100.0
 
 
 37
 1959

 Carnation 9,625 8.6
 Morton 3,182 2.9
 Utah Pie 38,372 34.3
 Pet 39,639 35.5
 Others 20,911 18.7
 _______ _____
 Totals 111,729 100.0

 1960

 Carnation 22,371.5 12.1
 Morton 3,350 1.8
 Utah Pie 83,894 45.5
 Pet 51,480 27.9
 Others 23,473.5 12.7
 _________ _____
 Totals 184,569 100.0

 1961

 Carnation 20,067 8.8
 Morton 18,799.5 8.3
 Utah Pie 102,690 45.3
 Pet 66,786 29.4
 Others 18,565.5 8.2
 _________ _____
 Totals 226,908 100.0
 
 
 38
 Many frozen pie manufacturers gave rebates from their list of offering prices in the form of advertising allowances for stated periods, upon proof of advertising by the purchaser on tear sheets furnished to the purchaser for that purpose. There was no requirement as to size of advertisement, and the advertisement needed only to be run one time to qualify the purchaser for an allowance. The dollar amount of the allowance was not determined by the quantity of frozen pies purchased, nor by the size or frequency of the advertisement, and the small purchaser who advertised received the same allowance per case as the large purchaser. In effect, the advertising allowance is a discount and fixes the net per case price of the pies purchased.
 
 
 39
 We now turn to separate statements of the facts particularly applicable in each appeal. However, from time to time in each of such statements, facts will appear which obviously have general application in the other two appeals, but which we think can be better stated in the context of the statement wherein they appear.
 
 II
 
 No. 7309
 
 
 Factual Statement in the Pet Appeal
 
 
 40
 Pet is a corporation engaged in the manufacture and sale of food products, including frozen pies. Its main office is in St. Louis, Missouri. Its frozen pie manufacturing plants are located in Frankfort, Michigan, Chambersburg, Pennsylvania, and Fresno, California.
 
 
 41
 Pet sells and distributes its pies from its three plants throughout the United States. From 1958 to 1962, inclusive, it was a competitor of Utah Pie in the Salt Lake City market. Pet entered the frozen pie business in 1955, by the acquisition of a frozen pie plant at Beulah, Michigan. Initially, its pies were made in four flavors and distributed in a relatively small north central territory, the Detroit-Chicago-Milwaukee area. In order to expand its frozen pie business nationwide, Pet moved its plant from Beulah to Frankfort, and then in 1956 acquired its plant at Fresno, and in 1957 its plant at Chambersburg. It marketed its pies under the brand, Pet-Ritz. It added new flavors and undertook to accelerate consumer acceptance and demand through an extensive advertising campaign, which emphasized the quality of its pies. This advertising included advertising in local newspapers, distribution of coupons that might be used in purchasing pies, and demonstrations in grocery stores to show how easily the pies could be prepared for consumption. It also included a large expenditure for advertising on a half-hour television program, starring Red Skelton.
 
 
 42
 Soon after Pet entered the frozen pie industry, the nature of the market began to change. As frozen pies became more and more in demand, numerous regional or local companies, such as Utah Pie, entered the business. Because of the freight advantage, which they had over the national companies, whose products usually had to be shipped into a region from a distance, the local and regional companies were able to sell at lower prices than the national companies had been charging. Emphasis in many regional markets shifted from quality to price, and price became the principal factor of competition. With the increase of price competition, prices of frozen pies declined.
 
 
 43
 During 1957 and 1958, while prices were declining and the market was expanding, Pet's sales of frozen pies did not keep pace with the expanding market. In the Salt Lake City market, total sales in 1959 were 1.96 times total sales in 1958, while sales of Pet-Ritz pies were 1.52 times sales in 1958; total sales in 1960 were 1.64 times total sales in 1959, while Pet-Ritz sales were 0.58 times sales in 1959; and total sales in 1961 were 1.24 times total sales in 1960, while Pet-Ritz sales were 0.46 times sales in 1960.
 
 
 44
 During the period 1958 to 1961, inclusive, the total sales of Pet-Ritz pies were the following percentages of all brands of frozen fruit pies sold in the Salt Lake City market: 1958 — 16.4 per cent; 1959 — 12.7 per cent; 1960 — 4.5 per cent; 1961 — 1.7 per cent. The decrease was due to the fact that other brands were being sold below the Pet-Ritz price in that market.
 
 
 45
 When Pet realized that advertising efforts were not enough to check its continuing decrease in sales, it made William N. Harsha, who had been the managing director of Pet's Canadian corporation, general manager of the Pet-Ritz Frozen Foods Division. It assigned him to different divisions of Pet to study its operations and financial and production problems. After a review and study of Pet's operations, Harsha decided to curtail the advertising and effect economies by eliminating duplication in overhead, increasing processing efficiency, improving production methods, reducing warehousing costs, and reducing freight costs by better scheduling of deliveries. Pet also decided to make an analysis of the frozen pie market to determine what kind of pie the housewife preferred. It was then known that the housewife was price conscious, but Pet, having spent large sums in advertising the Pet-Ritz brand as a quality product, did not want to reduce the quality of that pie to enable it to compete with lower-priced pies. As part of the effort to analyze the market, a research director was employed, who began his studies in June, 1959. Soon thereafter, the Market Research Corporation of America was engaged to make a study to help Pet decide whether or not to add a smaller and lighter economy brand of frozen pies. The result of these studies indicated that there was a market for a frozen economy pie and Pet introduced its Swiss Miss pie in Denver in April, 1960, and elsewhere in the United States, including Utah, in August, 1960. Swiss Miss is an eight-inch, 20-ounce pie. Utah Pie's brands are all eight-inch, 24-ounce pies. While it did not fully meet the price competition, it enabled Pet to compete more effectively, improved the profit picture of the frozen goods operation, and restored some of Pet's distribution with major chains.
 
 
 46
 In addition to adding the lighter-weight, lower-priced Swiss Miss to its line of fruit pies to improve its competitive position, Pet also entered into negotiations with Safeway Stores, Inc., for the production for it of frozen fruit pies under the Bel-air label. It sold Safeway 25,462.5 dozen Bel-air frozen fruit pies in 1959, and in December of that year secured a contract to supply Safeway with Bel-air frozen fruit pies during 1960. Under this contract, Safeway agreed to purchase not less than 500,000 dozen and not more than 1,000,000 dozen frozen fruit pies in 1960, and Pet agreed to manufacture and deliver such pies to Safeway.[11] The minimum quantity was stipulated, because Pet had to buy new equipment to handle the added production, and assurance of a minimum purchase was needed to compensate for the cost of the equipment.
 
 
 47
 Exhibits introduced by Utah Pie reflect cost studies made of Bel-air frozen pies sold by Pet to Safeway. They show Pet's costs of manufacture, sale and delivery of such pies were $0.4980 less than such costs of like pies sold under its regular labels, and that the difference in price to Safeway of such Bel-air pies and the price such like pies sold to other customers was only $0.4275. The difference in cost justified the difference in price under the cost justification proviso in § 2(a) of the Clayton Act (15 U.S.C. § 13(a)).
 
 
 48
 Safeway regularly followed the practice of requiring the sellers of its frozen pies to justify any reduction in price to it by a showing of cost difference. It did so with respect to the sales of Bel-air pies to it by Pet, under the December, 1959 contract, by an express provision therein so requiring.
 
 
 49
 Simultaneously with such efforts to cut costs and improve volume of sales, Pet, in 1958, began to reduce its advertising expenditures for frozen pies. From $866,116 in 1959, its advertising expenditures were reduced to $337,510 in fiscal 1961, and to $42,562 in fiscal 1962.[12]
 
 
 50
 By the time the present case came on for trial, Pet's frozen food division, the chief operation of which was the production of frozen fruit pies, was making a net profit.
 
 
 51
 The Pet-Ritz pies were always sold in the Salt Lake City market at prices substantially higher than the prices at which the pies of Utah Pie, all of which were of the same weight and quality as Pet-Ritz, were sold.
 
 
 52
 In August, 1960, when the first Swiss Miss apple pie was sold in the Salt Lake City market, the price thereof was $3.29 per dozen. At the same time, the larger and heavier Frost `N' Flame apple pie of Utah Pie was sold at a price of $3.00 per dozen. Thereafter, during the period covered by this action, the Swiss Miss apple pie ranged in price from $3.24 to $3.38 per dozen, while the Frost `N' Flame apple pie ranged in price from $2.75 to $3.10 per dozen.
 
 
 53
 Except during the periods or months hereinafter noted in this paragraph, the prices at which the Swiss Miss frozen pies were sold were always higher than the prices at which the larger and heavier Frost `N' Flame pie were sold in the Salt Lake City market; and even in such periods or months the prices of Swiss Miss were higher than the prices of Frost `N' Flame on an ounce-for-ounce basis; and professional buyers for resale always take into consideration differences in size and weight. In the period September, 1960, through November, 1961, the price of the Swiss Miss cherry pie, if difference in weight be disregarded, was lower than the price of Frost `N' Flame cherry pie. That was true of Swiss Miss peach pie in August and October, 1960, and January, February, March, June and September, 1961, and of Swiss Miss boysenberry pie from August, 1960, through December, 1961. It was never true of Swiss Miss apple pie.
 
 
 54
 Gaylen Rigby testified for Utah Pie, as follows:
 
 
 55
 "* * * with all of our advantages that we had, * * * we knew that we could not enter the market unless we could come up with a price that would interest the wholesalers in putting in our product. We knew we'd have to be a few pennies under our competition because of our locale." (Emphasis supplied.)
 
 
 56
 In January, 1958, the first date that comparative prices are shown in the record, Utah Pie's prices, instead of being a few pennies, were from 68 cents to $1.24 per dozen lower than the price of Pet-Ritz pies, the only pies Pet was then selling in the Salt Lake City market. In that month, in that market, Utah brand frozen apple pies were sold at a price of $4.15 per dozen; while Pet-Ritz frozen apple pies were sold at prices ranging from a low of $4.84 per dozen, to a high of $5.00 per dozen. During 1958, the Pet-Ritz frozen apple pies were sold at wholesale in that market at prices that were approximately $1.00 per dozen higher than the prices at which Utah brand apple pies were being sold by Utah Pie. During 1959, the difference ranged from 12 cents to 62 cents per dozen; during 1960, from 54 cents to $1.28 per dozen; and during 1961, from 58 cents to $1.89 per dozen.
 
 
 57
 Plaintiff's Exhibit 112 reflects the price lists and special deals offered by Pet in Wyoming, Washington, Utah, Oregon, Montana, Idaho, Colorado, southern California and northern California in 1958, 1959, 1960 and 1961. A chart annexed hereto as Appendix II analyzes month by month the lowest absolute price offered by Pet for apple pie in each of such markets. By lowest absolute price is meant the list price, less any deals offered, whether direct discounts from the invoice price or advertising allowances. Apple pie figures are used, because it is the volume leader, sells at the lowest price of the frozen pies, and is the price indicator.
 
 The chart shows the following:
 
 58
 Pet's absolute price for apple pie was uniform in Wyoming, Utah, Montana, Idaho and Colorado from January, 1958, through November, 1959; at no time during that period was Pet's price in Utah lower than its price in any of the other market areas; and during such period Pet's lowest price was always in northern California, southern California, Washington, or Oregon.
 
 
 59
 In December, 1959, Pet's Utah price was $3.80 per dozen, while its price in Wyoming, Washington, Oregon, Montana and Colorado was $4.00 per dozen, but in that same month Pet offered apple pie in northern California for $3.70 per dozen and in southern California for $3.60 per dozen.
 
 
 60
 During four months in 1960, Pet charged less for apple pie in Utah than it did in some of its other market areas, but at all times during 1960, Pet's Utah price was higher than its price in southern California and was the same or higher than its price in northern California.
 
 
 61
 In January and February, 1961, Pet's lowest offering price for apple pie was $3.70 per dozen and was made in Utah, Montana and Colorado; in March and April, 1961, Pet's lowest offering price for apple pie was $3.56 per dozen and was made in Utah, Montana and Idaho; and from May through August, 1961, Pet's apple pie price in Utah was the same or higher than its apple pie prices in its other market areas.
 
 
 62
 Thus, in only nine of the 44 months here involved, was Pet's price for apple pie lower in Utah than in any of its other market areas, and in only four months, January, February, March and April, 1961, was Pet's price in Utah the lowest of any of its other market areas.
 
 
 63
 Furthermore, a comparison of Utah Pie's absolute apple pie prices, shown by its Exhibit 91, and set forth in a chart annexed hereto as Appendix III, and Pet's lowest absolute prices, reflected in Appendix II, shows that at no time during the 44-month period of May, 1958, through December, 1961, were Pet's Utah prices lower than Utah Pie's prices.
 
 
 64
 Pet introduced a machine tabulation of invoices of actual sales of frozen fruit pies by it to customers in seven cities in the western states, during the period from May, 1958, through December, 1961. The seven cities were selected because most of Pet's frozen fruit pies sold in the western states are sold through wholesalers in these cities.
 
 
 65
 Pet's Exhibit A-40 has particular relevancy to Utah Pie's allegation of territorial price differences, namely, that Pet charged lower prices for its frozen fruit pies in the Salt Lake City market than it charged in the market area in which its pies were made or in other western markets. It shows the lowest invoice prices at which Pet-Ritz frozen apple pies were sold in Salt Lake City and the six selected cities, and we reflect the pertinent part thereof in a chart annexed hereto as Appendix IV.
 
 
 66
 During the period covered by the tabulation (44 months in all), the lowest price at which Pet-Ritz frozen apple pies were sold by Pet to wholesalers in Salt Lake City was lower than the lowest price at which such pies were sold by Pet to wholesalers in Los Angeles, in only three months — December, 1959, March, 1961, and April, 1961. The following table lists these prices, as well as the lowest price at which Utah Pie sold frozen apple pies under its Utah brand in Salt Lake City in the same months:
 
 
 67
 Lowest Price Charged for a Dozen Frozen Apple Pies

 Pet-Ritz Utah Pie 

 Los Angeles Salt Lake City Salt Lake City 

 December, 1959 $ 3.90 $ 3.84 $ 3.60
 March, 1961 4.26 4.24 3.10
 April, 1961 4.26 4.08 3.50
 
 
 68
 During the same period, the lowest price at which Pet-Ritz frozen apple pies were sold by Pet to wholesalers in Salt Lake City was lower than the lowest price at which such pies were sold by Pet to wholesalers in San Francisco in only seven months — December, 1959, August, 1960, September, 1960, January, 1961, February, 1961, March, 1961, and April, 1961. The following table lists the lowest prices at which Pet-Ritz pies were sold in each of the cities during these months, and the lowest price at which Utah Pie sold its 24-ounce Utah brand frozen apple pies in Salt Lake City during those months:
 
 
 69
 Lowest Price Charged for a Dozen Frozen Apple Pies

 Pet-Ritz Utah Pie 

 San Francisco Salt Lake City Salt Lake City 

 December, 1959 $ 4.00 $ 3.84 $ 3.60
 August, 1960 4.40 4.28 3.50
 September, 1960 4.40 4.28 3.16
 January, 1961 4.40 4.28 3.43
 February, 1961 4.40 4.28 3.50
 March, 1961 4.40 4.24 3.10
 April, 1961 4.48 4.08 3.50
 
 
 70
 The number of Pet-Ritz frozen apple pies sold in Salt Lake City at such lower prices is almost inconsequential. They were as follows:
 
 
 71
 December, 1959 125.0 dozen
 August, 1960 45.0 dozen
 September, 1960 52.5 dozen
 January, 1961 12.5 dozen
 February, 1961 27.5 dozen
 March, 1961 27.5 dozen
 April, 1961 25.0 dozen
 ___________
 Total 315.0 dozen
 
 
 72
 The introduction of the "economy" Swiss Miss pie by Pet to enable it to compete with lower-priced pies in various markets has been discussed earlier. One question with respect to that pie remains. Was it sold at lower prices in the Salt Lake City market than in California, where the pies were manufactured? Utah Pie introduced no evidence whatsoever to sustain any burden of proving lower prices for Swiss Miss pies in the Salt Lake City market. The Swiss Miss pie was first sold in Salt Lake City in August, 1960. The present complaint was filed in September, 1961. Exhibit A-40 also shows all the actual sales of Swiss Miss pies in such seven western cities in 1960 and 1961, and we reflect the pertinent part thereof in that respect in a chart annexed hereto as Appendix V. During only one of the intervening 13 months was the lowest price at which the Swiss Miss apple pie was sold in Salt Lake City lower than the price at which the pie was sold in San Francisco and at no time was the price in Los Angeles higher than the lowest price in Salt Lake City. In addition, during this entire period, the price of the Frost `N' Flame pie, manufactured by Utah Pie, was always lower than the price of the lighter (by four ounces) Swiss Miss pie. The following tabulation permits a comparison of the prices.
 
 
 73
 Lowest Price Per Dozen-Apple Pies

 Swiss Miss Frost `N' Flame

 Salt Lake City Los Angeles San Francisco Salt Lake City 

 August, 1960 $ 3.29 $ 3.05 $ 3.29 $ 3.00
 September 3.25 3.05 3.17 3.00
 October 3.25 3.05 3.17 3.10
 November ---* 3.05 3.05 3.10
 December --- 3.05 3.29 3.10
 January, 1961 3.29 3.05 --- 3.10
 February 3.25 3.05 --- 3.10
 March 3.25 3.05 --- 3.10
 April 3.25 3.05 --- 3.10
 May 3.25 3.05 3.29 3.10
 June 3.25 3.05 3.21 2.75
 July 3.29 3.05 3.29 2.75
 August --- --- 3.17 2.75
 
 
 
 Notes:
 
 
 *
 --- indicates no sales were made in the month
 
 
 
 74
 Even when Utah Pie's prices for Frost `N' Flame were down to $2.75 per dozen in July and August, 1961, it made a profit on its sales thereof.
 
 
 75
 In 1958, Utah Pie sold 37,969.5 dozen frozen pies in the Salt Lake City market, which was 66.5 per cent of the total sales volume. In 1958, Pet sold 9,336.5 dozen frozen pies in that market, which was 16.4 per cent of the total sales volume. In 1958, neither Utah Pie nor Pet sold any Bel-air pies to Safeway.
 
 
 76
 In 1959, Utah Pie sold 38,372 dozen frozen pies in that market, which was 34.3 per cent of the total sales volume. In 1959, Pet sold 39,639 dozen frozen pies in that market, which was 35.5 per cent of the total sales volume. However, in 1959, in that market, Utah Pie sold no Bel-air frozen fruit pies to Safeway and Pet sold in that year 25,462.5 dozen Bel-air frozen fruit pies to Safeway. Pet's market share, or percentage of total sales volume in that year, with frozen fruit pies sold to Safeway excluded, was 12.7 per cent.
 
 
 77
 In 1960, Utah Pie sold 83,894 dozen frozen pies in that market, which was 45.5 per cent of the total sales volume. In 1960, Pet sold 51,480 dozen frozen pies in that market, which was 27.9 per cent of the total sales volume. However, in 1960, in that market, Utah Pie sold no Bel-air frozen fruit pies to Safeway, while Pet sold 22,694 dozen Bel-air frozen fruit pies to Safeway, and Pet's market share, or percentage of the total sales volume, with the frozen fruit pies it sold to Safeway excluded, was 15.6 per cent.
 
 
 78
 In 1961, Utah Pie sold 102,690 dozen frozen pies in that market, which was 45.3 per cent of the total sales volume. In 1961, Pet sold 66,786 dozen frozen pies in that market, which was 29.4 per cent of the total sales volume. However, in 1961, in that market, Utah Pie sold no Bel-air frozen fruit pies to Safeway, while in that year Pet sold Safeway 14,897.5 dozen frozen fruit pies, and Pet's market share or percentage of total sales volume, with the frozen fruit pies sold by it to Safeway excluded, was 22.9 per cent.
 
 
 79
 We have shown Pet's share of the market, with Bel-air frozen fruit pies excluded, in 1959, 1960, and 1961, because it was clearly established by uncontradicted and uncontroverted evidence that Safeway was not willing in those years to purchase frozen fruit pies from Utah Pie, for the reason that it was unable to persuade Utah Pie to install means and procedures that would insure uniform quality of Bel-air frozen fruit pies produced by Utah Pie and sold by it to Safeway. In other words, Safeway imposed as a condition to its purchase of any Bel-air frozen fruit pies from Utah Pie that such installations be made by Utah Pie. The primary reason Safeway imposed such conditions was that it was unwilling to risk damage to the fine reputation it was building up for Bel-air frozen fruit pies by the maintenance of a constant high quality of such pies, through the unwitting sale by it of Bel-air pies, the quality of which fell below such high standard of quality. Other reasons are set forth in subjoined note[13]. It follows that Pet's sales of Bel-air frozen fruit pies to Safeway in 1959, 1960, and 1961 took no frozen fruit pie business away from Utah Pie. If Pet had not sold the Bel-air frozen fruit pies to Safeway in those years, the latter would have purchased them from some other manufacturer than Utah Pie, who was willing to meet Safeway's manufacturing conditions and requirements[14]
 
 
 80
 In 1958, the market share of sellers in the Salt Lake City market, other than Utah Pie's and the defendants', was 5.5 per cent, and in 1959 it increased to 18.7 per cent, a gain of 13.2 per cent. The aggregate of such 13.2 per cent and the 22.8 per cent of Pet's market share attributable to Bel-air sales in 1959 more than equals the percentage of market share decrease of Utah Pie in 1959 from 1958. Moreover, Pet's share of the market, exclusive of its sales of Bel-air pies to Safeway, was only 12.7 per cent of the total market share, in 1959, while its share in 1958 was 16.4 per cent, and that included the sales of all kinds of frozen pies. The loss Utah Pie suffered in market share in 1959 was not attributable in anywise to Pet's competition.
 
 
 81
 In 1960, Utah Pie sold 4,608.5 dozen frozen mince and 5,336.5 dozen frozen pumpkin Bel-air pies to Safeway. In 1961, Safeway requested Utah Pie to pack its Bel-air mince pies in a new carton. Utah Pie advised Safeway it would not do so, unless it was given Safeway's frozen fruit pie business, then going to Pet. That Safeway would not do. As a result, Safeway only purchased 50 dozen frozen mince pies from Utah Pie in 1961, just enough to let Utah Pie use up the old cartons and shipping cases it had on hand, but it purchased 6,483 dozen Bel-air frozen pumpkin pies from Utah Pie in that year. This further shows that Utah Pie's failure to sell frozen pies to Safeway was not due to competitors' prices, but to Utah Pie's unwillingness to meet Safeway's requirements.
 
 
 82
 Pet's market share, exclusive of Bel-air frozen fruit pies sold to Safeway, increased in 1961 over 1960, 7.3 per cent, but uncontroverted facts show that gain did not result from a loss by Utah Pie. In 1960, Utah Pie sold 4,608.5 dozen Belair mince pies to Safeway. Due to its unwillingness to use the new type carton Safeway requested, it sold Safeway only 50 dozen mince pies in 1961. It is apparent that no problems with respect to new cartons existed as to pumpkin pies, because Utah Pie sold Safeway 1,146.5 more pumpkin pies in 1961 than it did in 1960. The only reasonable inference is that had Utah Pie been willing to adopt the new carton for mince pies, it would have sold Safeway at least as many mince pies in 1961 as it did in 1960, and had it done so, its market share in 1961 would have been 46.8 per cent, instead of 45.3 per cent. In 1960, Pet's Swiss Miss sales accounted for 11.1 per cent of the total sales in the Salt Lake City market, while its Pet-Ritz sales accounted for only 4.5 per cent thereof. In 1961, Pet's Swiss Miss sales accounted for 21.2 per cent of the total sales in such market, while its Pet-Ritz sales accounted for only 1.7 per cent thereof. Pet's increase in market share in 1961 was due solely to the increase in its sales of Swiss Miss pies, and that pie, on an ounce-for-ounce basis, was always sold at a higher price than Utah Pie's Frost `N' Flame pie. In only one month, May, 1961, was Swiss Miss sold at a higher price in San Francisco than in Salt Lake City.
 
 
 83
 Moreover, the market share percentage of sellers in the Salt Lake City market, other than Utah Pie and the defendants, decreased 4.5 per cent and their sales volume decreased 4,902 dozen in 1961; and it is reasonable to infer that Pet's market share increase in 1961 derived from such decreases suffered by such other sellers. But in view of the fact that Utah Pie had a substantial sales volume increase in 1961 and would have had a market share percentage increase in that year, had its sales of Bel-air frozen mince pies not substantially decreased due to its refusal to adopt a new carton, it would be unreasonable to infer that Pet's gain resulted from any sales loss by Utah Pie.
 
 
 84
 The total sales volume in dozens and the percentage of market share of Utah Pie and Pet in the Salt Lake City market, with the Bel-air sales to Pet excluded, in the years 1958 to 1961, inclusive, were as follows:
 
 
 85
 Volume of Sales Market Share
 Pet Utah Pie Pet Utah Pie
 1958 8,336.5 37,969.5 16.4 66.5
 1959 14,176.5 38,372 12.7 34.3
 1960 28,786 83,894 15.6 45.5
 1961 41,888.5 102,960 22.9 45.3
 
 
 86
 In 1962, Utah Pie's volume increased to 129,658.3. Pet's volume and its and Utah Pie's market share percentages are not shown in the record.
 
 
 87
 Even if Bel-air sales by Pet be included in its volume, Utah Pie greatly outdistanced Pet in 1960 and 1961.
 
 
 88
 On June 23, 1960, Schenk, general manager of the Frozen Foods Division of Pet, went to the Utah Pie plant in Salt Lake City, represented that he was a frozen food broker from the Northwest, and asked to be permitted to go through the plant. Permission was granted and later Schenk prepared a report showing defects in Utah Pie's equipment and operations, to be used by D. T. Dittman of Pet in negotiating with Safeway for the latter's business in competition with Utah Pie. Of course, Pet's conduct was reprehensible and is not to be condoned. However, the information contained in Dittman's report was never conveyed to Safeway personnel. Dittman so testified and so did Young, Safeway's buyer. It thus appears that the Dittman report was never used by Pet in its competitive efforts with Utah Pie.
 
 III
 
 No. 7306
 
 
 Factual Statement in the Continental Appeals
 
 
 89
 These appeals involve two claims — the § 2(a) claim asserted by Utah Pie and the § 2(a) counterclaim asserted by Continental.
 
 
 90
 Continental marketed its pies under the brand, Morton. It is an eight-inch, 22-ounce pie and is lighter and smaller than the pies of Utah Pie, all of which are eight-inch, 24-ounce pies.
 
 
 91
 The counterclaim was based upon the differences between the prices for which Utah Pie systematically sold frozen pies to retail chain stores and the substantially higher prices for which it sold them to other customers in the Salt Lake City market. Such differences resulted from the sales by Utah Pie under private and controlled labels to favored customers, which it began in 1960. Under those labels, Utah Pie sold its only size, grade, and quality of pie to the large favored buyers at substantially lower prices than other buyers were required to pay for Utah Pie's regular Utah brand. For example, in mid-1960 Utah Pie was selling its Utah brand frozen pie for $3.60 per dozen, while it was selling an identical pie under its Frost `N' Flame brand exclusively to Associated Grocers at $3 per dozen. And on April 4, 1960, Utah Pie by letter offered to sell Safeway, packed under its Bel-air label and delivered to its warehouse in Salt Lake City, frozen apple pies at $3 per dozen and frozen cherry and boysenberry pies at $3.30 per dozen. It was also selling at that time its Sonny Boy brand for $2.88 per dozen, f. o. b. Salt Lake City, for delivery to buyers in Spokane.
 
 
 92
 On the other hand, Utah Pie's claim against Continental was based upon price differences to noncompeting customers in unrelated geographical areas. It is a "primary line" case. It is mainly based upon two isolated two-week offers of its frozen pies, one made by Continental in June, 1961, and the other in July, 1961, to buyers in the Salt Lake City market at times when Continental was a marginal seller and Utah Pie was a dominant seller in the area.
 
 
 93
 It is apparent that Utah Pie's dramatic increase in sales volume in the years 1958 to 1962, inclusive, (see table, page 142, infra) in large part was due to the low prices at which it sold frozen pies to Associated Grocers, Utah Wholesale Grocery and Safeway. Associated Grocers was the largest buyer in the market, serving 150 to 175 retail stores out of its Salt Lake City headquarters. Beginning in 1960 and continuing thereafter, Utah Pie sold Associated Grocers pies under its controlled label, Frost `N' Flame. That pie, identical with the pie marketed by Utah Pie under its Utah brand, was exclusive with Associated Grocers and was sold at a price 50 to 60 cents per dozen less than Utah Pie charged nonfavored competing purchasers for its Utah brand. Associated Grocers' tremendous competitive advantage, thus attained, caused it to support Frost `N' Flame almost exclusively in its advertising. It also guaranteed Utah Pie's dominant position in the market by foreclosing the largest buyer from effective competition. Frost `N' Flame quickly replaced Utah brand as the leading brand.
 
 
 94
 Utah Pie also produced pumpkin and mince pies for Safeway, the second largest buyer, under Safeway's private label, Bel-air, at prices substantially below those it charged for its identical pie sold under the Utah label to nonfavored competing stores. Utah Pie also continually offered Safeway a preferentially low price on its frozen fruit pies packed under its Bel-air label. Safeway rejected those offers, not because of price, but for another reason fully set out in the Factual Statement in the Pet Appeal. In its first year of sales of Bel-air mince and pumpkin pies to Safeway, 1960, Utah Pie charged what Utah Pie later itself said was a "rock bottom" price, with the hope that it would induce Safeway to drop its then supplier, Pet Milk, in favor of Utah Pie.
 
 
 95
 In 1961, Utah Pie began selling its private label Mayfresh pies to Grand Central-American Stores, another of the four large buyers in the Salt Lake City market.
 
 
 96
 The adverse impact on Utah Pie's competitors was very substantial. From the time Utah Pie gave Associated Grocers its controlled label preference, Continental was unable to sell Associated Grocers a single pie. After Utah Pie began its controlled label sales to Grand Central Stores, Continental was unable to sell that company, and when the arrangement was extended early in 1962 to American Food Stores, which had been acquired by Grand Central, Continental lost the only chain that had been a more or less steady customer. Similarly, as to Safeway, Continental, up to June, 1961, was unable to make a single sale. In that month it made a sale to Safeway's food stores in Salt Lake City.
 
 
 97
 Continental enjoyed substantial sales in the Salt Lake City market in 1957, but from 1958 to 1960, inclusive, it was a negligible competitor in the Salt Lake City market. With the advent of Utah Pie as a competitor in 1958, Continental's volume in dozens fell to 754 and its market share to 1.3 per cent. In 1959, its volume of sales in dozens was 3,182 and its market share 2.9 per cent. In 1960, its volume of sales in dozens was 3,350 and its market share 1.8 per cent. In 1961, its sales increased and its total volume in dozens of sales in that year was 18,799.5 and its market share 8.3 per cent, but by the beginning of the fourth quarter of 1960, Continental had reduced the cost of its pies laid down in more nearly compete with Utah Pie's prices in the Salt Lake City market area. Salt Lake City to a point where it could
 
 
 98
 Another basis of comparison is the number of times food retailers advertised Utah Pie's brands and Continental's Morton brand during the years 1957 to 1961, inclusive. This, because the undisputed evidence clearly established that retail newspaper advertising is necessary to frozen pie sales success. The following table shows the number of times retailers advertised the respective brands of Utah Pie and Continental in the five-year period.
 
 
 99
 1957 1958 1959 1960 1961

 Utah Pie 3 27 30 59 76
 Continental 13 0 3 1 5
 
 
 100
 After the entry of Utah Pie into the Salt Lake City market in 1957, with its lower priced pies, Continental, because of its higher costs of production and transportation, was unable to keep its prices competitive with Utah Pie's prices. In 1960, with the advent of Utah Pie's controlled and private label prices, Continental ceased to maintain a sales representative in the market and was virtually out of the market. However, Continental continued in an effort to reduce its costs of production in order to become competitive. In 1960, it was successful in locating a "co-packing" operation in the heart of the California fruit growing region, which permitted fruit to be processed directly from the trees into the finished pie, without large intermediate packaging, storing and shipping expenses. By such efforts, Continental was able to reduce its cost of apple pies laid down at Salt Lake City from approximately $3.75 per dozen in 1958 to approximately $2.80 per dozen in the second quarter of 1961. See chart annexed hereto as Appendix VI. It was also able to reduce its costs of other flavors laid down in Salt Lake City in comparable amounts. Having thus reduced its costs, Continental was again in a position to offer its Morton pies direct to buyers in the Salt Lake City market at prices which it hoped might prove to be competitive. In October, 1960, Continental contracted with a Salt Lake City food broker in an effort to resume distribution of its full line of Morton frozen food products in the Salt Lake City market. For seven months, from November, 1960, to June, 1961, the broker attempted to sell Continental frozen pies at prices generally competitive with Utah Pie's Utah brand.
 
 
 101
 During that period the broker called on the trade throughout the Salt Lake City market area, offering various short-term price concessions in the form of advertising allowances on pies, as well as other products in the Continental line. On the frozen pies, these price concessions ranged from $1.20 per dozen off the $4.50 list price on mince pies to 84 and 70 cents per dozen off the $4.00 list price on apple, cherry, and boysenberry pies, respectively. At these net prices, Continental was able to make only a total of seven sales to three small buyers in the outlying areas of Ogden, Boise, and Pocatello. It could make no sales to the major buyers, all located in Salt Lake City. The few sales it made did not adversely affect Utah Pie. During those seven months, Continental's best price offers, made on the price-per-ounce basis used by professional buyers in comparing prices, were competitive with prices offered by Utah Pie on its Utah brand. By June, 1961, it seemed apparent that if Continental was to recapture any portion of the market, it had to make better offers.
 
 
 102
 Continental was unable to sell to small buyers in the Salt Lake City area, because they lacked the refrigerated storage space necessary to buy direct from Continental. Continental could sell not less than a quarter of a truckload. Utah Pie, with its plant in Salt Lake City, was the only manufacturer who could feasibly sell directly to the small buyers. Of the largest buyers, Associated Grocers was handling Frost `N' Flame brand at $3.10 per dozen, the lowest price on the market; Grand Central was about to close a deal with Utah Pie for its own private label, Mayfresh, at the same prices charged Associated Grocers; and Safeway was buying its Bel-air frozen fruit pies exclusively from Pet Milk, from whom it could purchase three brands, including its own private label, in combined truckload shipments. Confronted with that situation, Continental's broker recommended that it meet the price being charged to Associated Grocers and offered to Grand Central, by offering apple pies at $2.85 per dozen on full truck quantities. This was approximately the ounce-for-ounce equivalent of Utah Pie's $3.10 price. Indeed, Continental's price was 1.08 cents per ounce and Utah Pie's price was 1.07 cents per ounce. In comparing Continental's prices with Utah Pie's prices, the fact that Continental's pies were 22 ounces in weight and Utah Pie's pies were 24 ounces in weight should be taken into consideration. Professional buyers evaluate competing offers on a price-per-ounce basis, although retail purchasers do not always give attention to the differences in the size of pies. Moreover, Continental's price was for full truck orders, only, while Utah Pie's price applied to orders of any size, down to a few dozen.
 
 
 103
 Continental approved the recommendation and a $2.85-$2.89 delivered price, depending on quantity ordered, was offered for a two-week period to those few buyers potentially able to buy from Continental. At the same time, Continental extended on a continuing basis for the Salt Lake City market area an offer of 30 cents per dozen freight allowance. At these prices, Continental made sales to American Food Stores in Ogden and to Associated Grocers in Pocatello, a small independent branch in Pocatello, both of which had previously purchased Morton pies, and at the time of the sale were not purchasing from Utah Pie.
 
 
 104
 In June, 1961, the merchandising manager for Safeway's food stores in Salt Lake City, purchased 6,250 dozen frozen pies, their requirement for five weeks,[15] from Continental, and in July, 1961, Grocers Wholesale of Salt Lake City, a small wholesaler just starting in business, ordered 1,000 dozen frozen pies from Continental.
 
 
 105
 Utah Pie responded to Continental's offer, which lasted only two weeks and was once renewed a month later for the same period, by reducing its price on all of its 24-ounce apple pies, whatever the brand name, to $2.75 per dozen and offering all the customers unlimited quantities, to be delivered in lots of any size. When Continental learned of such offer by Utah Pie, and the merchandising manager for Safeway's food stores in Salt Lake City urged it to further reduce its price, it agreed with him to cancel an order he had already placed at the $2.85 price; and also offered to cancel another order placed by American Food Stores, rather than reduce its price to Utah Pie's offer, but American Food Stores did not elect to cancel its order. During the period 1958 to 1962, inclusive, in the Salt Lake City market, Continental reached its highest sales volume in June and July, 1961. Thereafter, its sales volume continuously decreased through 1962. Its 1962 sales volume was 8,685 dozen less than its 1961 volume. June and July, 1961, were also high sales volume months for Utah Pie, higher than any of the five preceding months and many other earlier months; and from July, 1961, on through 1962, its sales volume continued to increase. Its sales volume reached a new annual high in 1962, when it showed an increase of 26,968.3 dozen over 1961. Thus, Utah Pie effectively maintained its dominant position and discouraged further efforts by Continental to meet the low prices which Utah Pie continued to maintain throughout 1961 and 1962.
 
 
 106
 Continental was able in 1961 to increase its volume to 18,799.5 dozen and its market share percentage to 8.3, but in 1962 its volume dropped to 10,114.5 dozen, while Utah Pie's volume in that year was 129,658.3 dozen, an increase of 26,968.3 dozen over 1961. The record does not reflect facts from which market shares can be computed in 1962.
 
 
 107
 Invoices of sales of frozen pies by Continental in the Salt Lake City market during the period 1958 to January, 1962, inclusive, showed 142 items were sold at a profit and three items, one in 1958, one in 1961, and one in January, 1962, at a loss, before allocation of overhead costs. Its overall sales showed a profit before deduction of overhead. After such allocation, an overall loss was reflected. Had Continental been able to develop a substantial volume of sales in such market, it no doubt would have been able to realize a profit after overhead was charged. But when it looked as though its efforts would become fruitful by the contract it secured with the Salt Lake City Safeway stores and Grocers Wholesale in 1961, Utah Pie reduced its price on its Utah and Frost `N' Flame brands and the contract with Safeway was cancelled. Utah Pie maintained its reduced price for a long period thereafter.
 
 
 108
 Utah Pie also suffered a loss on its sales of frozen pies in 1958, notwithstanding it captured 66.5 per cent of the Salt Lake City market area in that year and sold a large volume of pies, and notwithstanding its low transportation and selling costs and its other competitive advantages. Its low price in 1958 could not, therefore, be justified by lower costs. By a large increase in its volume in 1959, 1960, and 1961, it was able to make substantial profits, just as it is fair to say Continental could have done, from 1961 on, had it succeeded in obtaining a substantial volume of sales.
 
 
 109
 The following table graphically shows a comparison of Utah Pie's and Continental's respective sales volume and market share percentage for the years 1958 to 1961, inclusive, and the sales volume for 1962[16] in the Salt Lake City market.
 
 
 110
 Sales Volume % of 
 in Dozens Market

 1958 (Utah Pie 37,969.5 66.5
 (Continental 754 1.3
 1959 (Utah Pie 38,372 34.3
 (Continental 3,182 2.9
 1960 (Utah Pie 83,894 45.5
 (Continental 3,350 1.8
 1961 (Utah Pie 102,690 45.3
 (Continental 18,799.5 8.3
 1962 (Utah Pie 129,658.3
 (Continental 10,114.5
 
 IV
 
 No. 7308
 
 
 Factual Statement in the Carnation Appeal
 
 
 111
 The claim against Carnation was tried on the theory of low prices in the Salt Lake City market and high prices in the Los Angeles market, at which Carnation sold its frozen pies.
 
 
 112
 Carnation entered the frozen pie business in 1955, by acquiring a Los Angeles company then engaged in manufacturing and selling frozen pies in Utah and elsewhere under the Simple Simon label, or brand. Carnation made substantial improvements in its predecessor's plant at Torrance, California, (near Los Angeles) and radically altered its distribution system. At all times here material, Carnation marketed its Simple Simon pies in all western markets, that is, Los Angeles, San Francisco, Portland, Boise, Seattle, Spokane, Phoenix, Salt Lake City and Denver. Shortly after Carnation entered the field, the frozen pie business became highly competitive, marked by the introduction into the market of national brands, such as Pet's Pet-Ritz, Continental's Morton, and a number of other national brands. Also, in some of such national markets there were regional brands, such as Mary Elizabeth, County Fair, Frigid Dough, Chet's and others, and also those of local manufacturers, such as Utah Pie, with their brands.
 
 
 113
 In order to meet the competitive activities of other manufacturers in the various markets in which it sold its pies, Carnation developed a program of special temporary price reductions, varying from market area to market area, and depending on local competitive conditions. These programs were called "deals" in the trade. In some areas they took the form of advertising allowances, identical with those described in the General Statements of Facts, supra. However, in Utah the allowances were not permitted to be considered in computing "cost" under the Utah "cost plus six per cent" minimum markup law (13-5-7 Utah Code Anno. 1953). Carnation accordingly adopted "off invoice" deals for Utah and other markets where similar statutes were in effect. Both types of deals had the same competitive purpose, namely, to induce the retailer to purchase and advertise Carnation pies and thereby meet the competitive tactics of other manufacturers having a like aim. All deals had two aspects in common. They were of a temporary nature and they were offered to all purchasers alike in each market.
 
 
 114
 Since deals were directed at local competitive conditions, they differed in duration, type and amount in each market area, so that Carnation's net prices in each of the national market areas also frequently differed. At times during the period 1958 to 1961, Carnation's prices in the Utah area were higher than those charged in the Los Angeles area and at times they were lower. There was no relationship between the prices in the two areas. The price in each was determined by local competitive conditions.
 
 
 115
 In addition to Utah Pie's lower price structure, other competitive conditions in the period 1958 to 1961 affected the market price and the market for Simple Simon pies in the Salt Lake City market. In 1958, Safeway introduced a private brand, Bel-air, manufactured by the Pet Milk Company. Though of a similar grade and quality, it was sold at a lower price than Simple Simon. In late 1959, Utah Pie introduced a controlled label, Frost `N' Flame, for marketing through Associated Grocers, the largest group of cooperative buyers in that market. In 1961, it introduced another controlled label, Mayfresh, for marketing through Grand Central American in that market. The effect of a controlled label is to tie the purchaser to a single supplier. Such was the effect here on Associated Grocers and Grand Central American.
 
 
 116
 Frost `N' Flame and Mayfresh pies were of similar quality with Simple Simon and other brands sold in Utah, but were introduced and sold at prices considerably below Carnation's prices for Simple Simon pies, as well as Utah Pie's own Utah brand. Utah Pie's Utah brand and its Frost `N' Flame brand were concededly identical pies with different labels.
 
 
 117
 Utah Pie's sales to Associated Grocers increased from 18,621 cases in 1959 to 77,894 cases in 1960, and 102,834 cases in 1961, while sales in the entire Salt Lake City market area only doubled in size between 1959 and 1961.
 
 
 118
 The three largest buyers of frozen pies in the Utah market, whose advertising set the Utah market prices, were Associated Grocers, Safeway, and Utah Wholesale Grocery. In 1961, Utah Pie sold to Associated Grocers nearly nine times as many pies as did Carnation, while in 1958, Utah Pie sold Associated Grocers only three and one-half times as many pies as did Carnation. By the end of 1961, Carnation was entirely out at Safeway, the year in which Utah Pie sold Safeway 36,202 dozen frozen pies, including 6,533 dozen Bel-air mince and pumpkin pies and 11,568 dozen pies under Utah Pie's own brand. In 1958, Carnation sold four times as many pies as Utah Pie to Utah Wholesale Grocery, but in 1961, Utah Pie sold six and one-third times as many pies as did Carnation to Utah Wholesale Grocery. During the four-year period, Utah Pie's sales to the "big three" were over 240,000 dozen, while Carnation's were less than 30,000 dozen.
 
 
 119
 Utah Pie's books showed that for the fiscal year 1957, the last year in which it was engaged solely in the fresh pie business, it lost approximately $5,500. In its fiscal year 1958, when it seized 66.5 per cent of the frozen pie market through its price cutting activities, it had an operating loss of $1,264.51. During each of the fiscal years 1959, 1960, and 1961, it showed a substantial profit.
 
 
 120
 To make the comparison between Carnation and Utah Pie more graphic, we set forth in subjoined note[17], in parallel vertical columns, the percentage of the market share in the Salt Lake City market; and in like columns the volume of sales in dozens by Carnation and Utah Pie in each of the years 1958 to 1962, inclusive.
 
 
 121
 Carnation's total sales volume in the Salt Lake City market in 1957 was 9,286 dozen. But in 1958, in a rapidly expanding market, its volume was only 5,863 dozen. Moreover, its sales volume did not keep pace with the rapidly expanding Salt Lake City market in 1959, 1960 and 1961, and in 1962 its volume in that market fell to an all-time low of 5,329.5 dozen.
 
 
 122
 Appendix VII, annexed hereto, is a chart which sets forth month by month in the first, second, third and fifth columns of figures the lowest absolute prices offered by Carnation for apple pie in the San Francisco, Spokane, Denver and Salt Lake City markets, and in the fourth column the lowest absolute price at which Utah Pie sold its Utah brand frozen apple pies in the Salt Lake City market. By "absolute price" is meant the list price, less any deals offered, whether direct discounts from invoices or allowances for advertising. This chart covers the period from January, 1958, to August, 1961.
 
 
 123
 An examination of such chart shows that Carnation's absolute price for apple pie[18] was uniform in the Spokane, Denver and Salt Lake City markets from January, 1958, through October, 1959; that during that period Carnation's price in the Salt Lake City market was always the same as or higher than its price in the fourth market area, San Francisco; and that during such time the only variations in Carnation's prices were in the San Francisco market, with such variations making the price in that market lower than its price in the other areas from time to time.
 
 
 124
 The chart further shows that in February, 1960, Carnation's Utah price was lower than its San Francisco price, and in March, April, May, October, November and December, 1960, its Salt Lake City market price was lower than its Spokane market price, but that at no time during 1960 was the Salt Lake City market price the lowest price offered by Carnation in the several markets.
 
 
 125
 The chart further shows that from January, 1961, to July, 1961, Carnation's Salt Lake City market price was lower than its San Francisco and Spokane market prices, and that in August, 1961, its Salt Lake City market price was lower than its Spokane and Denver market prices, but in 1961 Carnation's Salt Lake City market price was never the lowest price offered by Carnation in the several markets.
 
 
 126
 The chart further shows that in only eight months of the 44 months here involved was Carnation's price for its Simple Simon pie lower than Utah Pie's price for its Utah brand pie in the Salt Lake City market, the months being October, November and December, 1958, July, 1959, February and March, 1960, and February and April, 1961.
 
 
 127
 Utah Pie's price for its Frost `N' Flame pie from the time it was first introduced in August, 1959, through 1961, was always lower than Carnation's price for its Simple Simon pie, in the Salt Lake City market. In Appendix VIII, we set forth Utah Pie's sale prices for its Frost `N' Flame apple pie and Carnation's offering prices for its Simple Simon apple pie from August, 1959, to August, 1961, inclusive, in the Salt Lake City market. It will be noted therefrom that the prices for the Simple Simon applie pie were always substantially higher than the prices for the Frost `N' Flame apple pie during that period.
 
 
 128
 Appendices VII and VIII show that Carnation's prices for its Simple Simon pie from August, 1959, to August, 1961, inclusive, were always higher in the four markets covered in Appendix VII, of which the Salt Lake City market is one, than Utah Pie's prices for its Frost `N' Flame pie in the Salt Lake City market, in that period, except in Denver in October, 1960, and January, February, March, April and May, 1961. Frost `N' Flame was sold exclusively to one customer in Salt Lake City.
 
 
 129
 Carnation's prices for other pies, through its deal offers in the Salt Lake City market, were at times below and at times above Utah Pie's price for its Utah brand.
 
 
 130
 There was no proof of a price difference by Carnation in the Salt Lake City market and Los Angeles market, the the original theory advanced by Utah Pie. Furthermore, the San Francisco market, where price differences did occur, was not an area of stable prices. From time to time advertising discounts from list price were granted and allowed by Carnation and others in the San Francisco market. Moreover, there were substantial differences in competitive conditions in the northern California and Salt Lake City markets, two wholly unrelated markets, throughout the period here involved. Utah Pie, from the beginning, resorted to price cutting to obtain the introduction of its pies and to hold business it had acquired. For example, on October 11, 1960, Utah Pie assured Safeway that the Bel-air price it had made to Safeway was lower than that offered to its regular trade, but was justified by savings Utah Pie would realize in the cost of manufacturing, sale and delivery, but when Utah Pie raised its price for mince and pumpkin pies to Safeway in 1961, it stated in a letter to Safeway that its 1960 price to Safeway was at "rock bottom" and was made to Safeway, because Utah Pie was anxious to introduce its product to Safeway and felt that the price it made in 1960 would get Safeway's business and "work into something for the future," evidently referring to Bel-air frozen fruit pies. In April, 1960, it offered to sell frozen fruit pies to Safeway at preferentially low prices. And in 1959 Utah Pie sold frozen mince and pumpkin pies to Busley's Super Market, a new customer in Denver, at $3.70 per dozen. Busley's purchasing agent testified it could sell such pies at 33 cents each, a price lower than such pies had ever been sold in Denver, and that at such price "this item would have a terrific drawing power." At that time the going price for such pies was 47 to 49 cents retail and $4.25 per dozen wholesale.
 
 
 131
 It should be noted that 1958, the year in which during the months of October, November and December Carnation's price for its Simple Simon pie was lower than Utah Pie's price for its Utah brand, was the year in which Utah Pie's market share of all the pies sold in the Salt Lake City market zoomed to 66.5 per cent. And further, that in 1959, when Utah Pie's market share fell to 34.3 per cent, Utah Pie's prices for its Utah brand, except in the month of July of that year, were always lower than Carnation's prices for its Simple Simon pie in the Salt Lake City market. And further, that in 1960, when Utah Pie's prices for its Utah brand were lower, except in two months, February and March, than Carnation's prices for its Simple Simon pie, and when Carnation's prices were always higher than Utah Pie's prices for its Frost `N' Flame pie in the Salt Lake City market, Utah Pie's market share increased 11.2 per cent over the previous year and its volume more than doubled, being a 45,522 dozen increase over the previous year, while Carnation's market share increased only 3.5 per cent and its volume only 12,746.5 dozen. And finally, that in 1961, when Utah Pie's prices for its Utah brand were lower, except in two months, February and April, than Carnation's prices for its Simple Simon pie, and when Carnation's prices were always higher than Utah Pie's for its Frost `N' Flame pie in the Salt Lake City market, Utah Pie's market share decreased two tenths of one per cent and its volume increased 18,796 dozen over the previous year, and Carnation's market share decreased 3.3 per cent and its volume decreased 2,304.5 dozen from the previous year.
 
 
 132
 The market shares, respectively, of Utah Pie, Carnation, and all other sellers in the Salt Lake City market area in the years 1958 to 1961, inclusive, were as follows:
 
 
 133
 1958 1959 1960 1961

 Utah Pie 66.5% 34.3% 45.5% 45.3%
 Carnation 10.3% 8.6% 12.1% 8.8%
 All other
 sellers 23.2% 57.1% 42.4% 45.9%
 
 
 134
 What Utah Pie lost in 1959 went not to Carnation, but to other sellers in that market area, as did Carnation's market share loss in that year.
 
 
 135
 The market share of both Carnation and Utah Pie increased in 1960, but it is clear that those gains resulted from loss of market share by sellers other than Utah Pie and Carnation. In 1961, Carnation's share dropped back to approximately where it was in 1959, Utah pie remained at approximately its 1960 percentage share, and other sellers gained slightly more than Carnation lost.
 
 
 136
 Carnation's reduction of prices in the Salt Lake City market was made in an effort that was far from successful to compete with the prices at which Utah Pie offered and sold its pies. Clearly, Carnation was never able to compete with Utah Pie's Frost `N' Flame pie price, and only part of the time with the price at which Utah Pie priced and sold its Utah brand pies.
 
 
 137
 Carnation did not make up losses on sales of frozen pies in the Salt Lake City market area through profits on sales of frozen pies in other market areas.
 
 
 138
 Carnation's receipts from sales of frozen pies in the Salt Lake City market exceeded its direct costs, that is, manufacturing, spoilage and transportation costs. It probably also exceeded direct costs, if selling costs were included therein, but on the record before us we can only ascertain with certainty whether its receipts from sales exceeded direct costs, with selling costs included, as to apple pie sales. Carnation's offering prices for apple pie exceeded its direct costs, that is, manufacturing, spoilage, transportation and selling costs in each of the 44 months herein involved, except in February and March, 1960. In those months, its lowest offering price was $3.30 per dozen and its direct costs were $3.39 per dozen. Moreover, its average direct costs for the 44-month period were, manufacturing — $2.934, spoilage — $0.02, transportation — $0.35, and selling — $0.282, or $3.586 per dozen. Its average lowest offering price for apple pie in such period was $3.915 per dozen. Hence, its average lowest offering price exceeded such average direct costs by $0.329 per dozen.
 
 
 139
 Carnation made forecasts of losses in different markets from year to year, including the Salt Lake City market area, based on the experience of the previous year and future expectations, but there was no pattern of such forecasts. They varied from year to year and market to market.
 
 V
 
 Applicable Legal Principles
 
 
 140
 That part of § 2(a) here material is set forth below in note[19].
 
 
 141
 A trial court, in determining whether it will grant a motion for a directed verdict or for judgment n. o. v., should view the evidence in a light most favorable to the party against whom the motion is directed and give such party the benefit of all the inferences which the evidence reasonably supports, even though contrary inferences might reasonably be drawn therefrom, and if the evidence and inferences, so viewed and considered, are of such a character that reasonable men in the exercise of a fair and impartial judgment may reach different conclusions, the motion should be denied.[20] In reaching its determination "the court may not pass on the weight of the evidence or" decide "where the preponderance of the evidence lies. With the exception of clearly incredible evidence, the court should not consider or pass on the credibility of witnesses and should accept as true the evidence in favor of the party against whom the motion is directed."[21] In determining whether the motions by the defendants in the instant cases should have been granted, we have so viewed and considered the evidence.
 
 
 142
 A violation of § 2(a) embraces two essential elements: (1) A price difference as set forth therein; and (2) an effect resulting therefrom which "may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such" price difference.[22]
 
 
 143
 The fact that a seller doing an interstate business lowers his price in one market area, without making a corresponding reduction in all other market areas in which he sells, is not in and of itself a violation of § 2(a). That is especially true where the market areas involved are distinct, disconnected, unrelated, and heterogeneous, as are the areas involved in the instant case.[23]
 
 
 144
 It is true that "the statute is designed to reach such discriminations `in their incipiency,' before the harm to competition is effected. It is enough that they `may' have the prescribed effect."[24]
 
 
 145
 Chief Judge Murrah, speaking for this court in Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 10 Cir., 269 F.2d 950, 957, c. d. 363 U.S. 843, 80 S.Ct. 1608, 4 L.Ed.2d 1727, held the word "may" should be construed to mean "reasonable possibility," rather than the more positive phrase "reasonable probability." In support of his statement he cites Mr. Justice Black's opinion in Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, at page 46, 68 S.Ct. 822, at page 828, 92 L.Ed. 1196. Justice Black's statement that "the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they `may' have had such an effect" is based on the opinion of Chief Justice Stone in Corn Products Co. v. Federal Trade Commission, 324 U.S. 726, at page 742, 65 S.Ct. 961, but Justice Black's statement should be read in the light of another part of the Corn Products opinion, wherein the Chief Justice said, at page 738 of 324 U.S., 65 S.Ct. at p. 967 "the use of the word `may' was not to prohibit discriminations having `the mere possibility' of those consequences, (to substantially lessen competition) but to reach those which would probably have the defined effect on competition." (See note 14 to the opinion in the Morton Salt case, supra, 334 U.S. at page 46, 68 S.Ct. 822.)
 
 
 146
 "Reasonable possibility" means something more than "mere possibility."[25]
 
 
 147
 To establish a violation of § 2(a) there must be, in addition to proof of price differences, evidence sufficient to support a finding that the lower price, in the market area in which it occurred, did substantially lessen competition, or tended to create a monopoly, or injured, destroyed, or prevented competition with the person who granted such price difference, or the person who knowingly received the benefit thereof; or a finding that there is a reasonable possibility they will do so in the future.[26]
 
 
 148
 In American Oil Company v. F. T. C., 7 Cir., 325 F.2d 101, 104, c. d. 377 U.S. 954, 84 S.Ct. 1631, the court said:
 
 
 149
 "The adverse effect upon competition requisite to establish the Section 2(a) violation * * * is that the price discrimination creates a reasonable probability of substantial injury to competition * * *. Price discrimination does not per se constitute a violation of Section 2(a). * * * The price discrimination, * * * must in the particular factual situation involved be capable of raising a reasonable probability of substantially lessening ability to compete. The protection intended to be afforded by the statute is directed to the preservation of competition. The statute's concern with the individual competitor is but incidental. * * *"
 
 
 150
 In Atlas Building Prod. Co. v. Diamond Block & Gravel Co., 10 Cir., 269 F.2d 950, 954, c. d. 363 U.S. 843, 80 S.Ct. 1608, the court said:
 
 
 151
 "* * * Antitrust legislation is concerned primarily with the health of the competitive process, not with the individual competitor who must sink or swim in competitive enterprise. But as a necessary incident thereto, it is concerned with predatory price cutting which has the effect of eliminating or crippling a competitor. * * *"[27]
 
 
 152
 Congress sought to protect and foster competition, not to eliminate it.[28]
 
 
 153
 By the express wording of the statute, the effect on competition must be substantial. Trivial, remote, or inconsequential effect is not enough. "There must be something more than an essentially temporary minimal impact on competition."[29]
 
 VI
 
 The Decision and Directions for Judgement
 
 
 154
 The primary question presented by each of these appeals, except the one from the judgment against Continental on its counterclaim, is whether the evidence, when viewed in a light most favorable to Utah Pie and it is accorded the benefit of all the inferences the evidence fairly supports, was sufficient to support a finding as to each defendant that it by price differences or other acts had substantially lessened competition, tended to create a monopoly, or injured, destroyed, or prevented competition with it, or there was a reasonable possibility that by such acts it would do so in the future.
 
 
 155
 As we have heretofore stated, selling at lower prices in the Salt Lake City market than in other market areas in and of itself is not a violation of § 2(a).
 
 
 156
 We do not think Congress intended that nation-wide sellers in different, separate, distinct, heterogeneous and unrelated markets, with different competitive conditions, must sell at the same price levels in each of such markets. However, we think it did intend that such a seller should not indulge in price differences that had a reasonable possibility of substantially lessening competition or tending to create a monopoly, or to injure, destroy, or prevent competition with a person who grants or knowingly receives the benefit of such price differences. But it did not intend to proscribe a seller from fairly meeting competition.
 
 
 157
 We think the facts here speak for themselves. Utah Pie entered the frozen pie business shortly after the retail purchasers had become price conscious and when a lower retail price was an effective competitive force. It was not encumbered with a large advertising campaign and high manufacturing, transportation and selling costs. It was in a position immediately to take advantage of the situation by offering frozen pies at prices substantially lower than the current market prices in the Salt Lake City market. It was the first and arch price cutter in that market and it engaged in price cutting to obtain and retain frozen pie customers continuously, from the time it entered the business to the end of the period here involved. Lower prices were the principal means it employed to obtain and hold customers and it used such means very effectively. Through them it obtained the patronage of three of the largest retailers in that market. By the use of controlled labels, it effectively tied two of such major retailers to it as their sole supplier of frozen pies. It very substantially increased its sales volume from year to year, including 1962, and in each of the years 1958 to 1961, inclusive, had a very high percentage share of the total sales volume in the Salt Lake City market.
 
 
 158
 On the other hand, the defendants, early entrants into the frozen pie business, had depended on quality, ease and quickness of preparation, and large and expensive advertising campaigns to generate consumer appeal. Their manufacturing, transportation and selling costs were high. Their operations, in some respects, lacked efficiency. They could not change to lower prices to generate consumer appeal for their products, without making major changes and adjustments. They had to reduce costs by curtailing advertising, improving their manufacturing and transportation practices, and promoting efficiency in their operations generally. All this took time and none of them, during the period here involved, reached a position where it could fully compete pricewise with Utah Pie.
 
 
 159
 We, of course, recognize that it was not necessary for Utah Pie, in order to make a case against a defendant, to prove that its actions had already lessened competition, or tended to create a monopoly, or injured, destroyed, or prevented competition with such defendant, and that it was sufficient for it to prove that it was reasonably possible that such actions would do so in the future. But if such action did not substantially lessen competition, or tend to create a monopoly, or injure, destroy, or prevent competition with any of the defendants during the almost four years here involved; and regard be given also to Utah Pie's substantial volume increase in 1962 and the sharp volume decrease in 1962 of two of the defendants[30] from their 1961 volume, it would seem to be quite unlikely that such a result would probably flow from such actions in the future.
 
 
 160
 We will now consider the § 2(a) claims against each defendant separately.
 
 
 1. Pet
 
 
 161
 In the factual statement in the Pet appeal, we set forth the history of Pet in the frozen pie field and the actions it took and the things it did to better enable it to meet the growing lower price competition.
 
 
 162
 Up to August, 1960, the only frozen pie Pet was selling in the Salt Lake City market was its Pet-Ritz. Due to the lower prices at which other brands were being sold in that market, its Pet-Ritz sales did not keep pace with the rapid growth of frozen pie sales therein. In that market, in 1958, its total Pet-Ritz sales were 16.4 per cent of the total sales of all frozen pies, and in 1959, 12.7 per cent. But from the advent of Utah Pie's controlled label, Frost `N' Flame, in August, 1959, Pet's sales of its Pet-Ritz pies fell sharply and their total sale percentage in that market dropped to 4.5 per cent in 1960 and to 1.7 per cent in 1961.
 
 
 163
 Pet sold 25,462.5 dozen Bel-air frozen fruit pies to Safeway in 1959 in the Salt Lake City market, and in December of that year obtained a contract from Safeway to supply its requirement of Bel-air pies for its entire chain of food stores. Pet sold Bel-air frozen fruit pies in the Salt Lake City market in 1959, 1960 and 1961. Those sales afford no support for Utah Pie's § 2(a) claims, because uncontradicted evidence clearly established (1) that the reduced price at which they were sold was fully justified by the reduced costs of manufacture, sale and delivery, and (2) that had Pet not sold such frozen fruit pies to Safeway, it would not have purchased them from Utah Pie, for reasons other than price, fully set forth in the Factual Statement in the Pet Appeal.
 
 
 164
 In August, 1960, Pet introduced its Swiss Miss eight-inch, 20-ounce frozen pie in the Salt Lake City market.
 
 
 165
 During the years 1958 to 1961, inclusive, the Pet-Ritz pies were sold by Pet in the Salt Lake City market at prices substantially higher than the prices at which Utah Pie sold its brands, all of which were of the same weight and quality as Pet-Ritz, in that market. And from August, 1960, through 1961, Swiss Miss Apple pies were sold by Pet at higher prices than the larger and heavier Frost `N' Flame applie pies were sold by Utah Pie in the Salt Lake City market. During that period and in that market, Swiss Miss frozen fruit pies, other than apple pies, were sold at higher prices than Frost `N' Flame frozen fruit pies, other than apple, were sold, if consideration be given to difference in weight.
 
 
 166
 During December, 1959, and the months subsequent thereto, when Pet was selling its Pet-Ritz pies at lower prices in the Salt Lake City market than in other market areas, the sales of Pet-Ritz pies in the Salt Lake City market had decreased to a point where they were competitively insignificant in that market; and the sales volume of Pet-Ritz pies continued to decrease in that market in 1960 and 1961. Moreover, in the whole period December, 1959, through 1961, Utah Pie's prices for its Utah brand pie were always lower than Pet's prices for its Pet-Ritz pie in that market, although the two pies were of like size and quality.
 
 
 167
 During the 13-month period, August, 1960, to September, 1961, in only one month was the price for which Swiss Miss pie was sold in the San Francisco market higher than the price for which it was sold in the Salt Lake City market, and the price for which it was sold in that period in the latter market was never lower than the price for which it was sold in the Los Angeles market. And during all of those 13 months, Utah Pie sold its larger and heavier Frost `N' Flame pie in the Salt Lake City market at prices substantially less than the prices for which Pet sold its Swiss Miss pies in that market.
 
 
 168
 At all times during the period 1958 to 1962, inclusive, Utah Pie was a vigorous and effective competitor and remained financially prosperous, sound, and strong.
 
 
 169
 We conclude that the evidence was wholly insufficient to support a finding that Pet, by price differences or other acts, had substantially lessened competition, or tended to create a monopoly, or injured, destroyed, or prevented competition with it in the Salt Lake City market, or that there was a reasonable possibility that Pet, by price differences or other acts, would do so in the future, or that Pet had taken or would take in the future any appreciable amount of frozen pie business from Utah Pie.[31]
 
 
 170
 We conclude the judgment against Pet should be reversed.
 
 
 2. Continental
 
 
 171
 While Continental's sales of frozen pies in the Salt Lake City market were very substantial in 1957, its sales volume was so low in 1958, 1959 and 1960 that it was a negligible competitive factor in that market in those years.
 
 
 172
 The record is wholly barren of any proof that Continental in 1960 or in 1961, with the exception of one sale made in 1961, made any sales to a customer of Utah Pie, or that because of its sales Continental deprived Utah Pie of any frozen pie business it might otherwise have received.
 
 
 173
 All sales by Continental's broker in 1960, and up to June, 1961, were to comparatively small buyers and outside of Salt Lake City, and Utah Pie conceded they gave it no competitive difficulty.
 
 
 174
 In June, 1961, Continental did sell Safeway's local food stores in Salt Lake City 6,250 dozen pies, their requirement for about five weeks. Safeway was then a customer of Utah Pie and was buying from it Utah brand frozen fruit pies and Bel-air frozen pumpkin and mince pies. Utah Pie's sales to Safeway did decrease from 22,084.5 dozen in 1960 to 18,101 dozen in 1961. However, that decrease of 3,983.5 dozen is more than accounted for by the fact that Safeway purchased 4,558.5 dozen less Bel-air mince pies from Utah Pie in 1961 than it did in 1960, because of Utah Pie's refusal to adopt a new carton requested by Safeway. Moreover, Continental's business relations with Safeway, resumed in June, 1961, were short-lived, and after one sale and one order, later cancelled, they were terminated for a second time and not thereafter resumed.
 
 
 175
 While Continental attained its highest sales volume during the period 1958 to 1962, inclusive, in the Salt Lake City market in June and July, 1961, its sales volume thereafter continuously declined through 1962. On the other hand, Utah Pie's sales volume in June and July, 1961, was also high, higher than any of the preceding five months and many other earlier months, and from July, 1961, on, Utah Pie's sales volume substantially increased and reached an all-time annual high in 1962. Thus, it will be seen that the effect of Continental's sales in the Salt Lake City market in June and July, 1961, was at most minimal and clearly did not substantially lessen competition in the Salt Lake City market, nor injure or weaken Utah Pie as a competitor of Continental.
 
 
 176
 We conclude that the evidence was wholly insufficient to support a finding that Continental, by price differences or other acts, had substantially lessened competition, or tended to create a monopoly, or injured, destroyed, or prevented competition with it in the Salt Lake City market, or that there was a reasonable possibility that Continental, by price differences or other acts, would do so in the future, or that Continental had taken or would take in the future any appreciable amount of frozen pie business from Utah Pie.
 
 
 177
 With respect to Utah Pie's belated contention that the verdict against Continental can be supported by evidence of price discrimination violations in the Denver market area, little need be said. it is a departure from the theory on which Utah Pie, by its requested instructions, asked the court to submit its claim to the jury. It is a theory clearly not submitted to the jury by the court in its charge, nor passed on by the jury. The Denver market area was never mentioned and the Salt Lake City market was frequently referred to in the charge. The verdict returned was in a form submitted to the court by Utah Pie, and by its express language showed it was based solely on a price discrimination in the Salt Lake City market. For the reasons stated, such contention is clearly untenable.[32]
 
 
 178
 For these reasons, the judgment against Continental on Utah Pie's claim should be reversed.
 
 
 3. Carnation
 
 
 179
 Carnation was confronted with powerful competitive factors in the Salt Lake City market. Utah Pie's Frost `N' Flame pie, introduced in late 1959 and sold exclusively through Associated Grocers, and the Mayfair pie, introduced by Utah Pie in 1961 and sold exclusively through Grand Central American, were similar in quality, size and weight, with Carnation's Simple Simon, but were introduced and continuously sold at prices substantially below Carnation's price for its Simple Simon pie. In only eight months of the 44 months here involved was Carnation's price for its Simple Simon pie lower than Utah Pie's price for its Utah brand pie, the months being October, November and December, 1958, July, 1959, February and March 1960, and February and April, 1961.
 
 
 180
 In 1959, Safeway introduced its private brand, Bel-air. Utah Pie sold Bel-air mince and pumpkin pies to Safeway at prices below Carnation's price for its Simple Simon pies.
 
 
 181
 The controlled labels effectively tied Associated Grocers and Grand Central American to Utah Pie as their supplier. Utah Pie's sales to Associated Grocers increased from 9,310.5 dozen in 1959 to 38,947 dozen in 1960 and 51,417 dozen in 1961. In 1961, Utah Pie sold Associated Grocers nearly nine times as many pies as did Carnation, while in 1958 Utah Pie sold Associated Grocers only three and one-half times as many pies as did Carnation. In 1958, Carnation sold four times as many pies to Utah Wholesale Grocery as did Utah Pie, but in 1961 the situation was strikingly reversed when Utah Pie sold six and one-third times as many pies to Utah Wholesale Grocery as did Carnation.
 
 
 182
 By the end of 1961, Safeway, which had theretofore been a customer of Carnation, completely ceased buying pies from Carnation. During the four-year period, Utah Pie's sales to the big three were over 240,000 dozen, while Carnation's were less than 30,000 dozen.
 
 
 183
 In 1958, the year in which, during three months, the prices of the Simple Simon pie were lower than the prices of the Utah brand pie, Utah Pie's market share of all pies sold in the Salt Lake City market zoomed to 66.5 per cent.
 
 
 184
 In 1960, when the prices of the Utah brand pies were always lower than the prices of Simple Simon pies, except in two months, and when the prices of Simple Simon pies were always higher than the prices of Frost `N' Flame pies, Utah Pie's market share percentage increased 11.2 per cent over 1959, and its volume increased 45,522 dozen and was more than double its 1959 volume. But Carnation's market share percentage increased only 3.5 per cent and its volume only 12,746.5 dozen over its 1959 market share and volume.
 
 
 185
 In 1961, when the prices of Utah brand pies were always lower than the prices of Simple Simon pies, except in two months, and when the prices of Simple Simon pies were always higher than the prices of Frost `N' Flame pies, Utah Pie's market percentage decreased two tenths of one per cent and its volume increased 18,796 dozen over the previous year, and Carnation's market share percentage decreased 3.3 per cent and its volume decreased 2,304.5 dozen from the previous year.
 
 
 186
 In 1959, a year when the prices of Simple Simon pies were always higher, except in one month, than the prices of Utah brand pies, Utah Pie's market share percentage fell to 34.3 per cent, the lowest for the period involved, but its volume increased over the previous year, as did Carnation's, but Carnation's market share percentage decreased from 10.3 to 8.6 per cent, also its lowest for the period involved. And in that year Utah Pie sold approximately four times as many frozen pies as did Carnation.
 
 
 187
 Finally, in 1962, Utah Pie's sales volume of frozen pies reached an all-time high of 129,658.3 dozen, while Carnation's volume fell to an all-time low of 5,329.5 dozen.
 
 
 188
 The foregoing facts and others set forth in the Factual Statement in the Carnation Appeal clearly demonstrate that Carnation's sales and prices in the period 1958 to 1962, inclusive, did not substantially lessen competition in the Sale Lake City market, nor injure or weaken Utah Pie's ability as a competitor of Carnation in the Salt Lake City market. Moreover, a contention that Utah Pie was entitled to hold the extraordinary market share percentage of 66.5, attained in 1958, falls of its own dead weight. To approve such a contention would be to hold that Utah Pie was entitled to maintain a position which approached, if it did not in fact amount to a monopoly, and could not exist in the face of proper and healthy competition.
 
 
 189
 The evidence clearly shows that throughout the period 1958 to 1962, inclusive, Utah Pie was a vigorous, active, healthy and effective competitor in the Salt Lake City market and refutes a finding that Carnation, by price differences or other acts, had substantially lessened competition, or tended to create a monopoly, or injured, destroyed, or prevented competition with it in the Salt Lake City market, or that there was a reasonable possibility that Carnation, by price differences or other acts, would do so in the future, or that Carnation had taken or would take in the future any appreciable amount of frozen pie business from Utah Pie.
 
 
 190
 We conclude the judgment against Carnation should be reversed.
 
 
 4. Continental's Counterclaim
 
 
 191
 The record shows that counsel for Utah Pie intentionally and purposefully refrained from moving at any time for a directed verdict in its favor on the counterclaim.
 
 
 192
 In his argument to the jury, counsel for Continental limited his claim for a money recovery to nominal damages.
 
 
 193
 The court submitted to the jury the § 2(a) claim and two other claims no longer material and advised the jury that since Continental had limited its claim for a money recovery to nominal damages, if it found for Continental it "need not calculate the full amount" of damages and should award only one dollar.
 
 
 194
 The jury returned a verdict in which it found that "Utah Pie * * * has discriminated in the prices which it has charged to competing customers for frozen pies in the Utah-Idaho trading area in violation of Section 2 * * * and thereby proximately caused Continental * * * damage," for which it was awarded one dollar.
 
 
 195
 Thereupon, counsel for Continental moved for judgment on its counterclaim, including an award for attorneys' fees and costs. The court granted the motion. Thereafter, Utah Pie moved for judgment n. o. v., on the ground that the evidence was insufficient to support the finding that Utah Pie violated § 2(a), and on the ground that Continental failed to prove it suffered an impact or injury from such a violation. The court granted that motion and entered judgment for Utah Pie.
 
 
 196
 The Seventh Amendment to the Constitution of the United States provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."
 
 
 197
 Rule 50(b) of the Federal Rules of Civil Procedure in part provides:
 
 
 198
 "(b) Reservation of Decision on Motion. Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Within 10 days after the reception of a verdict, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; * *." In Slocum v. New York Life Ins. Co., 228 U.S. 364, 33 S.Ct. 523, 57 L.Ed. 879, "the Court decided that a state statute, providing for a judgment n. o. v. where a verdict should have been directed for insufficiency of evidence, could not, in the light of the Seventh Amendment, be followed in the federal courts pursuant to the Conformity Act." Moore's Federal Practice, 2nd Ed., Vol. 5, § 50.07.
 
 
 199
 Thereafter, however, in Northern Ry. Co. v. Page, 274 U.S. 65, 47 S.Ct. 491, 71 L.Ed. 929, where the federal district court followed the Massachusetts practice of entering judgment on the basis of one of two alternative verdicts requested of the jury because of the court's indecision as to whether a directed verdict was proper, the court held so to do was not a "`reexamination' within the intendment of the Seventh Amendment." Moore's Federal Practice, 2nd Ed., Vol. 5, § 50.07.
 
 
 200
 Then in Baltimore & Carolina Line v. Redman, 295 U.S. 654, 55 S.Ct. 890, 79 L.Ed. 1636, the Supreme Court held a federal district court could enter a judgment n. o. v. where, in accordance with state practice, the district judge had expressly reserved decision on a motion to dismiss or on a motion for a directed verdict. It distinguished the Slocum case, in that there a directed verdict was denied without any reservation of the question of the sufficiency of the evidence and the jury's verdict was taken unconditionally, while in the Redman case the court expressly reserved its ruling on the motions, based on an asserted insufficiency of the evidence to support a verdict for the plaintiff, a question of law to be resolved by the court, and the verdict for the plaintiff was taken pending the court's ruling on the motions and subject to those rulings. Moore's Federal Practice, 2nd Ed., Vol. 5, § 50.07.
 
 
 201
 The only changes made in the common law practice by Rule 50(b) were to make the reservation of the trial court's decision automatic and limit the time within which the motion for judgment n. o. v. may be made. Moore's Federal Practice, 2nd Ed., Vol. 5, § 50.07. It has application only if a motion is made upon which decision can be reserved. It is the reservation of decision, not the making of the motion, which is automatic. Absent a motion for a directed verdict or other like motion, no reservation of decision can be made, the verdict of the jury is returned unconditionally, and it may not be set aside on a motion n. o. v. or reviewed on appeal.[33]
 
 
 202
 Counsel for Utah Pie assert the instant case is distinguishable and not within the Rule, for the asserted reason that proof of impact, injury, and damage are jurisdictional. Of course, impact and injury to the plaintiff to his damage are essential elements of a claim for a violation of § 2(a) and must be proven, but that is true with respect to the essential elements of any claim asserted in a civil action. We do not concede that such elements of Continental's claim were not proven here, but even if they were not, the question of the sufficiency of the evidence to establish them had to be properly raised, by motion for a directed verdict or other like motion, before the case went to the jury and its unconditional verdict was returned. Not having been so raised and an unconditional verdict having been so returned, the court could not reexamine the facts found by the jury and pass on the sufficiency of the evidence to support the verdict on a motion for judgment n. o. v.
 
 
 203
 Utah Pie's conspiracy claim and § 2(a) claims and Continental's counterclaim were all tried at the same time. The portions of the evidence pertinent to all of such claims and the portions pertinent only to a particular claim were commingled and presented to the jury in mass. The jury's task of determining what evidence was pertinent to all of the claims and segregating those portions of the evidence pertinent only to the particular claims, respectively, was a most difficult if not an impossible one. Indeed, we found it very difficult so to do, when we had the printed transcript of the oral evidence and the written exhibits (either original or reproduced) before us, the benefit of the written briefs, and were able to proceed with due deliberation. Therefore, we think the ends of justice will be best served by a new trial of the issues raised on the counterclaim, where the only evidence adduced will be that pertinent to such issues. Accordingly, the judgment n.o.v. in favor of Utah Pie on the counterclaim is reversed and the cause remanded, with instructions to grant Utah Pie a new trial on the counterclaim. 28 U.S.C.A. § 2106. In so doing, we must not be understood as implying that we think the evidence adduced at the trial was not sufficient to take the case to the jury on the counterclaim issues.
 
 
 204
 The judgment in favor of Utah Pie on its § 2(a) claims is reversed and the cause remanded, with instructions to enter judgment for the defendants.
 
 APPENDIX I
 
 205
 YEARLY SALES OF APPLE PIE BY UTAH PIE
 COMPANY BY MARKET AREAS AND BRANDS

 (Figures in Dozens)

 Market
 Area No. Customers Brand 1958 1959 1960 1961

 Utah & Utah Brand 11,169.5 14,885.5 14,707.5 20,390.5
 Idaho 34 Frost `N'
 Flame 0 220 13,328.5 27,193
 Mayfresh 0 0 0 520.5
 ________ ________ ________ ________
 Total 11,169.5 15,105.5 28,036 48,104

 % total
 sales in
 all markets 98.7 97.18 83.15 90.6
 Oregon 1 Utah Brand 0 0 0 969.5
 ________ ________ ________ ________
 Total 0 0 0 969.5
 % total
 sales in
 all markets 0 0 0 1.8
 Spokane 1 Utah Brand 0 0 753.5 450
 Frost `N'
 Flame 0 0 529.5 500
 Sonny Boy 0 0 4,159 3,203.5
 ________ ________ ________ ________
 Total 0 0 5,442 4,153.5
 
 
 206
 Market
 Area No. Customers Brand 1958 1959 1960 1961

 % total
 sales in
 all markets 0 0 16.1 7.53
 Colorado 5 Utah Brand 0 401 16 23
 ________ ________ ________ ________
 Total 0 401 16 23
 % total
 sales in
 all markets 0 2.6 .05 .04
 Wyo. 5 Utah Brand 39.5 30.5 32 18
 ________ ________ ________ ________
 Total 39.5 30.5 32 18
 % total
 sales in
 all markets .35 .19 .1 .03
 Cal. & 7 Utah Brand 118 0 166.5 0
 Nevada (Cal. 1) Frost `N'
 (Nev. 6) Flame 0 5 50 0
 ________ ________ ________ ________
 Total 118 5 216.5 0

 % total
 sales in
 all markets 1.04 .03 .6 0
 Total,
 all
 markets 53 11,327 15,542 33,742.5 55,116.5
 
 APPENDIX II
 
 207
 LOWEST PET-RITZ OFFERING PRICES
 IN NINE MARKET AREAS

 (Prices are in Dozens)

 This appendix sets forth Pet's lowest offering prices for its Pet-Ritz frozen apple pie in
 each month here involved in each state, except in California, which is divided into
 Northern California and Southern California, with certain symbols, the meanings of
 which are set forth below.

 Symbols

 X = Pet's price higher than Utah Pie's in Utah.

 L = Pet's Utah price lower than in other areas.

 ____ = Lowest Pet price in all of areas shown.

 No. So.
 Date Wyo. Wash. Utah Ore. Mont. Idaho Colo. Cal. Cal.

 1958

 Jan. 4.76 4.76 X4.76 4.76 4.76 4.76 4.76 4.70 4.30
 Feb. 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.70 4.70
 Mar. 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.70 4.46
 Apr. 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.70 4.36
 May 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.48 4.38
 June 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.48 4.38
 July 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.44 4.34
 Aug. 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.32 4.22
 Sept. 4.92 4.92 X4.92 4.92 4.92 4.92 4.92 4.32 4.22
 Oct. 4.92 4.00 X4.92 4.00 4.92 4.92 4.92 4.00 4.22
 Nov. 4.92 4.00 X4.92 4.00 4.92 4.92 4.92 4.00 4.58
 Dec. 4.92 4.00 X4.92 4.00 4.92 4.92 4.92 4.00 4.58

 1959

 Jan. 4.32 4.32 X4.32 4.32 4.32 4.32 4.32 4.00 3.90
 Feb. 4.32 4.32 X4.32 4.32 4.32 4.32 4.32 4.00 3.90
 Mar. 4.32 4.32 X4.32 4.32 4.32 4.32 4.32 4.00 3.90
 Apr. 4.32 3.82 X4.32 4.32 4.32 4.32 4.32 4.00 3.90
 May 4.32 3.82 X4.32 4.32 4.32 4.32 4.32 4.00 3.90
 June 4.32 4.32 X4.32 4.32 4.32 4.32 4.32 4.00 3.90
 July 4.00 4.00 4.00 4.00 4.00 4.00 4.00 4.00 3.90
 Aug. 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 4.00 3.90
 Sept. 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 4.00 3.90
 Oct. 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 4.00 3.90
 Nov. 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 4.00 3.60
 Dec. 4.00 4.00 X3.80L 4.00 4.00 3.80 4.00 3.70 3.60

 1960

 Jan. 4.00 2.80 X4.00 3.40 4.00 4.00 4.00 3.70 3.60
 Feb. 4.00 2.80 X3.70L 3.40 4.00 3.40 4.00 3.70 3.60
 Mar. 4.00 4.00 X3.70L 4.00 4.00 3.40 4.00 3.70 3.60
 Apr. 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 3.70 3.60
 May 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 3.70 3.60
 June 4.00 4.00 X4.00 4.00 4.00 4.00 4.00 4.00 3.60
 July 4.00 3.88 X4.00L 4.36 4.00 4.00 4.00 3.52 3.66
 Aug. 4.00 4.36 X4.00L 4.06 4.00 4.00 4.00 3.86 3.46
 Sept. 4.00 3.86 X4.36 3.86 4.00 3.86 4.00 3.86 3.46
 Oct. 4.00 3.86 X4.36 3.86 4.36 3.86 4.00 3.36 3.90
 Nov. 4.00 4.36 X4.36 4.36 4.36 4.36 4.00 3.36 3.90
 Dec. 4.00 3.76 X4.36 4.36 4.36 4.36 4.00 4.36 3.90
 
 
 208
 No. So.
 Date Wyo. Wash. Utah Ore. Mont. Idaho Colo Cal. Cal.
 1961

 Jan. 4.00 3.76 X3.70L 4.06 3.70 4.00 3.70 4.00 3.90
 Feb. 3.80 3.76 X3.70L 4.06 3.70 4.00 3.70 4.06 3.90
 Mar. 3.56 3.76 X3.56L 4.06 3.56 3.56 4.00 3.96 3.86
 Apr. 3.64 3.76 X3.56L 3.76 3.56 3.56 3.64 3.86 3.56
 May 3.80 3.76 X4.36 4.36 4.36 4.36 3.64 3.86 3.56
 June 3.80 3.76 X4.36 4.36 4.36 4.36 4.00 3.86 3.56
 July 4.00 3.86 X4.36 4.36 4.36 4.36 4.00 3.86 3.46
 Aug. 4.00 3.86 X4.36 4.36 4.36 4.36 4.00 3.76 3.11
 
 APPENDIX III
 
 209
 LOWEST APPLE PIE SALE PRICES FOR UTAH BRAND AND FROST `N' FLAME BRAND
 IN THE SALT LAKE CITY MARKET

 (Prices are in Dozens)

 Date Utah Brand Frost `N' Flame Date Utah Brand Frost `N' Flame

 1958 Dec. 3.60 ----

 Jan. 4.15 ----* 1960
 Feb. 4.30 ---- Jan. 3.50 ----
 Mar. 4.30 ---- Feb. 3.50 ----
 Apr. 4.00 ---- Mar. 3.50 3.00
 May 4.00 ---- Apr. 3.00 3.00
 June 4.00 ---- May 3.50 3.00
 July 4.00 ---- June 3.35 3.00
 Aug. 4.00 ---- July 3.00 3.00
 Sept. 4.00 ---- Aug. 3.50 3.00
 Oct. 4.00 ---- Sept. 3.16 3.00
 Nov. 4.00 ---- Oct. 3.50 3.10
 Dec. 4.00 ---- Nov. 3.50 3.10
 Dec. 3.50 3.10

 1959 1961

 Jan. 4.00 ---- Jan. 3.43 3.10
 Feb. 4.00 ---- Feb. 3.50 3.10
 Mar. 4.00 ---- Mar. 3.10 3.10
 Apr. 4.00 ---- Apr. 3.50 3.10
 May 4.00 ---- May 3.40 3.10
 June 4.00 ---- June 2.75 2.75
 July 4.00 ---- July 2.75 2.75
 Aug. 3.60 3.70 Aug. 2.75 2.75
 Sept. 3.60 3.70
 Oct. 3.50 3.70
 Nov. 3.50 ----
 
 
 
 Notes:
 
 
 *
 ---- indicates no sales in that month
 APPENDIX IV
 LOWEST PET-RITZ APPLE PIE SALE PRICES IN SEVEN MARKETS

 (Prices are in Dozens)

 Salt Lake Los
 Date City San Francisco Seattle Portland Angeles Denver Spokane

 1958

 May 5.16 4.72 4.96 5.00 4.58 4.96 5.16
 June 5.00 4.68 5.00 5.00 4.58 4.92 5.16
 July 5.00 4.68 5.00 5.00 4.58 4.96 5.16
 Aug. 5.00 4.68 4.96 5.00 4.58 4.96 5.16
 Sept. 5.00 4.68 5.00 5.00 4.58 4.96 5.16
 Oct. 5.00 4.68 4.96 5.00 4.58 4.96 5.00
 Nov. 5.00 4.56 4.80 4.84 4.58 4.96 4.84
 Dec. 5.00 4.56 4.84 4.80 4.58 4.04 4.84

 1959

 Jan. 4.44 4.04 4.36 4.44 3.90 4.36 4.44
 Feb. 4.36 3.36 4.36 4.44 3.90 4.36 4.44
 Mar. 4.44 4.00 4.36 4.44 3.90 4.36 4.36
 Apr. 4.44 4.00 4.36 4.44 3.90 4.32 4.44
 May 4.44 4.00 3.82 4.44 3.90 4.32 4.44
 June 4.44 4.00 4.44 4.44 3.90 4.32 4.44
 July 4.12 4.00 ----* 4.64 3.94 4.00 4.04
 Aug. 4.12 4.00 ---- 4.48 3.90 4.00 4.04
 Sept. 4.12 4.00 ---- 4.48 3.90 4.00 4.04
 Oct. 4.04 4.04 ---- 4.48 3.90 4.00 4.04
 Nov. 4.12 4.00 ---- ---- 3.90 4.00 4.04
 Dec. 3.84 4.00 ---- ---- 3.90 4.00 4.04

 1960

 Jan. 4.12 4.00 4.12 ---- 3.90 4.00 4.12
 Feb. 4.12 4.00 4.00 ---- 3.90 4.00 4.00
 Mar. 4.04 4.00 ---- ---- 3.90 4.00 4.04
 Apr. 4.04 4.00 4.04 ---- 3.90 4.00 4.12
 May 4.12 4.00 4.12 ---- 3.90 4.00 4.12
 June ---- 4.00 4.04 4.28 3.90 4.00 4.12
 July 4.28 4.00 4.04 4.04 3.90 4.00 4.04
 Aug. 4.28 4.40 4.48 4.40 4.26 4.00 4.48
 Sept. 4.28 4.40 4.36 4.36 4.26 4.00 4.48
 Oct. 4.64 4.36 4.36 4.40 4.26 4.00 4.48
 Nov. 4.64 4.36 4.40 4.40 4.26 4.00 4.48
 Dec. 4.64 4.40 4.00 4.48 4.26 4.00 4.08

 1961

 Jan. 4.28 4.40 4.40 4.48 4.26 4.00 4.40
 Feb. 4.28 4.40 4.36 4.40 4.26 4.00 4.40
 Mar. 4.24 4.40 4.36 4.40 4.26 4.00 4.40
 Apr. 4.08 4.48 4.36 4.40 4.26 4.00 4.40
 May 4.48 4.40 4.40 4.48 4.26 3.84 4.40
 June 4.64 4.48 4.40 4.40 4.26 3.84 4.40
 July 4.64 4.48 4.48 4.40 4.26 4.00 4.40
 Aug. 4.64 4.48 4.40 4.40 4.26 4.00 4.40
 Sept. 4.64 4.40 3.80 4.40 4.26 4.00 3.80
 Oct. 4.64 4.40 3.80 4.48 4.26 4.00 3.80
 Nov. 4.64 4.48 3.90 4.40 4.26 4.00 3.86
 Dec. 4.64 4.64 4.64 4.48 4.26 4.00 4.36
 Notes:
 
 
 *
 --- indicates no sales in that month
 
 
 APPENDIX V
 
 210
 LOWEST SWISS MISS APPLE PIE PRICES IN SEVEN MARKETS

 (Prices are in Dozens)

 Salt Lake Los
 Date City San Francisco Seattle Portland Angeles Denver Spokane

 1960

 Apr. ----* ---- ---- ---- ---- 3.27 ----
 May ---- ---- ---- ---- ---- 3.22 ----
 June ---- ---- ---- ---- ---- ---- ----
 July ---- ---- ---- ---- ---- ---- ----
 Aug. 3.29 3.29 ---- ---- 3.05 3.22 ----
 Sept. 3.25 3.17 3.40 3.40 3.05 3.08 ----
 Oct. 3.25 3.17 3.19 ---- 3.05 ---- ----
 Nov. ---- 3.05 2.90 ---- 3.05 2.96 3.15
 Dec. ---- 3.29 ---- ---- 3.05 ---- 3.02

 1961

 Jan. 3.29 ---- 3.19 ---- 3.05 ---- 3.15
 Feb. 3.25 ---- 3.15 3.44 3.05 ---- 3.19
 Mar. 3.25 ---- 3.19 ---- 3.05 3.08 3.19
 Apr. 3.25 ---- 3.19 3.44 3.05 ---- 3.19
 May 3.25 3.29 3.19 ---- 3.05 3.09 3.19
 June 3.25 3.21 3.19 2.94 3.05 ---- 2.94
 July 3.29 3.29 3.02 3.02 3.05 2.94 3.19
 Aug. ---- 3.17 ---- ---- 3.05 ---- 3.19
 Sept. 3.25 3.21 3.27 3.19 3.05 2.94 3.19
 Oct. 3.25 3.17 3.15 ---- 3.05 ---- 3.19
 Nov. 3.25 3.17 ---- 3.19 3.05 ---- 3.15
 Dec. 3.25 ---- ---- ---- 3.05 ---- 3.17
 
 
 
 Notes:
 
 
 *
 --- indicates no sales in that month
 APPENDIX VI
 NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 APPENDIX VII
 LOWEST APPLE PIE OFFERING PRICES OF CARNATION BY MARKET AREAS,
 COMPARED TO UTAH PIE COMPANY'S LOWEST APPLE PIE PRICE IN
 SALT LAKE CITY MARKET FOR ITS UTAH BRAND PIE

 (Prices are in Dozens)

 Symbols

 Name of City = Frozen pie market area within and surrounding
 such city.

 X = Carnation Salt Lake City price higher than Utah
 Pie price.

 L = Carnation Salt Lake City price lower than other market
 areas.

 --- = Lowest Carnation price in all market areas.

 Carnation Utah Pie Carnation
 San Salt Lake Salt Lake
 Date Francisco Spokane Denver City City 

 1958

 Jan. 4.82 4.82 4.82 4.15 X4.82
 Feb. 4.82 4.82 4.82 4.30 X4.82
 Mar. 4.82 4.82 4.82 4.30 X4.82
 Apr. 4.58 4.82 4.82 4.00 X4.82
 May 4.38 4.82 4.82 4.00 X4.82
 June 4.38 4.82 4.82 4.00 X4.82
 July 4.34 4.82 4.82 4.00 X4.82
 Aug. 4.22 4.82 4.82 4.00 X4.82
 Sept. 4.22 4.82 4.82 4.00 X4.82
 Oct. 3.90 3.90 3.90 4.00 3.90
 Nov. 3.78 3.90 3.90 4.00 3.90
 Dec. 3.78 3.90 3.90 4.00 3.90

 1959

 Jan. 3.90 4.22 4.22 4.00 X4.22
 Feb. 3.90 4.22 4.22 4.00 X4.22
 Mar. 3.90 4.22 4.22 4.00 X4.22
 Apr. 3.90 4.22 4.22 4.00 X4.22
 May 3.90 4.22 4.22 4.00 X4.22
 June 3.90 4.22 4.22 4.00 X4.22
 July 3.90 3.90 3.90 4.00 3.90
 Aug. 3.90 3.90 3.90 3.60 X3.90
 Sept. 3.90 3.90 3.90 3.60 X3.90
 Oct. 3.50 3.90 3.90 3.50 X3.90
 Nov. 3.50 3.46 3.60 3.50 X3.70
 Dec. 3.40 3.46 3.60 3.60 X3.70

 1960

 Jan. 3.60 3.30 3.90 3.50 X3.90
 Feb. 3.60 3.30 3.30 3.50 3.30L
 Mar. 3.24 3.90 3.30 3.50 3.30L
 Apr. 3.48 3.90 3.30 3.00 X3.48L
 May 3.60 3.90 3.30 3.50 X3.84L
 June 3.42 3.90 3.36 3.35 X3.84L
 July 3.42 3.66 3.60 3.00 X4.02
 Aug. 3.86 3.90 3.50 3.50 X3.90
 Sept. 3.86 3.90 3.50 3.16 X3.90
 Oct. 3.26 3.96 2.50 3.50 X3.90L
 Nov. 3.26 3.96 3.10 3.50 X3.86L
 Dec. 3.76 4.26 3.10 3.50 X3.86L
 Carnation Utah Pie Carnation
 San Salt Lake Salt Lake
 Date Francisco Spokane Denver _______ City 

 1961

 Jan. 3.96 4.36 3.06 3.43 X3.46L
 Feb. 3.86 3.60 3.00 3.50 3.46L
 Mar. 3.76 3.60 3.00 3.10 X3.46L
 Apr. 3.76 3.60 3.00 3.50 3.46L
 May 3.76 3.60 3.00 3.40 X3.46L
 June 3.76 3.60 3.00 2.75 X3.46L
 July 3.66 3.60 3.00 2.75 X3.46L
 Aug. 3.11 3.60 3.80 2.75 X3.46L
 APPENDIX VIII
 COMPARISON OF LOWEST FROST `N' FLAME APPLE PIE SALE PRICES WITH LOWEST
 CARNATION APPLE PIE OFFERING PRICES, SALT LAKE CITY MARKET

 (Prices are in Dozens)

 Date Frost `N' Flame Carnation

 1959

 Aug. 3.70 3.90
 Sept. 3.70 3.90
 Oct. 3.70 3.90
 Nov. ----* 3.70
 Dec. ---- 3.70

 1960

 Jan. ---- 3.90
 Feb. ---- 3.30
 Mar. 3.00 3.30
 Apr. 3.00 3.48
 May 3.00 3.84
 June 3.00 3.84
 July 3.00 4.02
 Aug. 3.00 3.90
 Sept. 3.00 3.90
 Oct. 3.10 3.90
 Nov. 3.10 3.86
 Dec. 3.10 3.86

 1961

 Jan. 3.10 3.46
 Feb. 3.10 3.46
 Mar. 3.10 3.46
 Apr. 3.10 3.46
 May 3.10 3.46
 June 2.75 3.46
 July 2.75 3.46
 Aug. 2.75 3.46
 Notes:
 
 
 *
 --- indicates no sales in that month
 Notes:
 
 
 [1]
 Hereinafter called Utah Pie
 
 
 [2]
 Hereinafter called Continental
 
 
 [3]
 Hereinafter called Carnation
 
 
 [4]
 Hereinafter called Pet
 
 
 [5]
 Throughout the proceedings Utah Pie shifted from theory to theory as to the basis for its claims of § 2(a) violations. In the complaint, the theory was lower prices in Utah than in other western states; at the pretrial, it was lower prices in six western states and higher prices in "another area"; at the trial, it apparently was lower prices in the Salt Lake City market (which we will hereafter define) and higher prices in the Los Angeles market; and the injunctive decree was apparently based on lower prices in five western states and higher prices in the entire State of California. Moreover, in Utah Pie's brief in No. 7308, Utah Pie relies on lower prices in five western states and higher prices in northern California
 
 
 [6]
 It was stipulated that the only frozen fruit pies involved in these cases were frozen apple, cherry, peach, boysenberry, mince and pumpkin
 
 
 [7]
 The following is a tabulation of frozen pie advertisements, which appeared in the Salt Lake City newspapers from 1958 through 1961
 Brand 1958 1959 1960 1961 
 No. % of No. % of No. % of No. % of
 Ads Total Ads Total Ads Total Ads Total

 Utah 27 19.9 26 26.8 37 28.0 47 27.8
 Frost `N' Flame 0 0 4 4.1 22 16.7 25 14.8
 Mayfresh 0 0 0 0 0 0 4 2.4
 ___ _____ ___ _____ ___ _____ ___ _____
 TOTAL UTAH PIE 27 19.9 30 30.9 59 44.7 76 45.0
 Pet Ritz 26 19.1 13 13.4 2 1.5 0 0
 Swiss Miss 0 0 0 0 6 4.5 10 5.9
 ___ _____ ___ _____ ___ _____ ___ _____
 TOTAL PET 26 19.1 13 13.4 8 6.0 10 5.9

 Carnation
 (Simple Simon) 19 14.0 8 8.3 14 10.6 4 2.4
 Continental
 (Morton) 0 0 3 3.1 1 .8 5 2.9
 Bel-air 0 0 7 7.2 14 10.6 12 7.1
 Others 64 47.0 36 37.1 36 27.3 62 36.7
 ___ _____ ___ _____ ___ _____ ___ _____
 TOTAL 136 100.0 97 100.0 132 100.0 169 100.0
 
 
 [8]
 Safeway Stores, Inc., with its headquarters in Oakland, California, owns and operates 1,852 food stores in 27 states and the District of Columbia, extending from the East Coast to the West Coast of the United States
 
 
 [9]
 Hereinafter referred to as the "Salt Lake City market."
 
 
 [10]
 There are six pies in a case
 
 
 [11]
 Under such contract, Pet was to furnish Safeway's requirements of Bel-air frozen fruit pies for all of its food stores and shipments were to be made from the Pet plant nearest the point of delivery
 
 
 [12]
 On April 1, 1960, Pet changed its fiscal year for accounting purposes from the calendar year to a year ending March 31. Consequently, there is no fiscal 1960 in its accounting
 
 
 [13]
 In 1960, Safeway discovered that the Bel-air frozen pumpkin pies being furnished it by Utah Pie were below the quality the latter had agreed to maintain, both as to excess moisture content of pumpkin pies and the nonconformity of ingredients to stipulated formulas for both pumpkin and mince pies, and notwithstanding it had also agreed so to do, had failed to install a coding device by which Safeway could pinpoint a defective pie, even to the day of its production
 
 
 [14]
 While Safeway would not purchase frozen fruit pies packed under its Bel-air label from Utah Pie, for the reasons stated above, it was a large purchaser of other frozen pies from Utah Pie. Utah Pie sales of other frozen pies to Safeway was approximately 31,500 dozen in 1958, 16,500 dozen in 1959, 22,000 dozen in 1960, and 18,000 dozen in 1961
 In the years 1958 to 1961, inclusive, Pet sold no mince nor pumpkin Bel-air pies to Safeway.
 
 
 [15]
 Young, the Safeway Frozen Food Department Manager, testified that he has no control over the brands of frozen fruit pies that Safeway Division Managers purchase for their stores; that they are "autonomous in their purchases"; and do not have to stock Bel-air pies; that he has to "sell them on Bel-air."
 
 
 [16]
 Percentage of market for 1962 cannot be determined from record
 
 
 [17]
 
 Market Share

 1958 Carnation — 10.3% Utah Pie — 66.5%
 1959 Carnation — 8.6% Utah Pie — 34.3%
 1960 Carnation — 12.1% Utah Pie — 45.5%
 1961 Carnation — 8.8% Utah Pie — 45.3%

 Sales Volume

 1958 Carnation — 5,863 doz. Utah Pie — 37,969.5 doz.
 1959 Carnation — 9,625 doz Utah Pie — 38,372 doz.
 1960 Carnation — 22,371.5 doz. Utah Pie — 83,894 doz.
 1961 Carnation — 20,067 doz. Utah Pie — 102,690 doz.
 1962 Carnation — 5,329.5 doz.* Utah Pie — 129,658.5 doz.*

 (A lower level than any of
 the preceding five years.)
 
 
 *
 Record does not reflect total sales volume for 1962, hence percentage market share cannot be computed
 Frozen apple pie is the volume leader and price indicator. The frozen apple pie sales in the Salt Lake City market from 1957 to 1961, inclusive, of Utah Pie and Carnation, and of Carnation in 1962, were as follows:
 1957 1958 1959 1960 1961 1962
 ( 4 mo.)
 Utah Pie 893.5 10,312 13,285 27,225 46,791.5

 1957 1958 1959 1960 1961 1962
 (12 mo.)
 Carnation 3,234.5 2,391 3,164 8,455.5 6,885.5 1,802.5
 Another basis of comparison is retailer's advertising. In 1961, retailers advertised Utah Pie's brands 72 times and Carnation's only four times.
 
 
 [18]
 Again we use apple pie figures, because it is the most popular, lowest priced, and largest seller of the frozen pies
 
 
 [19]
 15 U.S.C. § 13(a) reads in part as follows:
 "(a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: Provided, That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: * * *."
 
 
 [20]
 Kippen v. Jewkes, 10 Cir., 258 F.2d 869, 873; Miller v. Brazel, 10 Cir., 300 F.2d 283, 286
 
 
 [21]
 Anderson v. Hudspeth Pine, Inc., 10 Cir., 299 F.2d 874, 876
 
 
 [22]
 F. T. C. v. Anheuser-Busch, Inc., 363 U.S. 536, 553, 80 S.Ct. 1267, 4 L.Ed.2d 1385; American Oil Company v. F. T. C., 7 Cir., 325 F.2d 101, 104, c.d. 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498; See also cases cited in note 26, page 149 infra
 
 
 [23]
 Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 231 F.2d 356, 366-368, c.d. 350 U.S. 991, 76 S.Ct. 545, 100 L.Ed. 856; Anheuser-Busch, Inc. v. F. T. C., 7 Cir., 289 F.2d 835, 840
 
 
 [24]
 Corn Products Refining Company v. Federal Trade Commission, 324 U.S. 726, 738, 65 S.Ct. 961, 967, 89 L.Ed. 1320; Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 46, 68 S.Ct. 822
 
 
 [25]
 See Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356-357, 42 S.Ct. 360, 361, 66 L.Ed. 653
 In that case, the court in construing the word "may" in § 3 of the Clayton Act, which makes it unlawful for any person to make a lease agreement, to sell or contract for sale of goods, or fix a price charged therefor, or a discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser shall not use or deal in the goods of a competitor or competitors of the lessor or seller, "where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce," said:
 "* * * But we do not think the purpose in using the word `may' was to prohibit the mere possibility of the consequences described. It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial."
 
 
 [26]
 Elgin Corporation v. Atlas Building Products Co., 10 Cir., 251 F.2d 7, 11, c.d. 357 U.S. 926, 78 S.Ct. 1371, 2 L.Ed.2d 1370: Federal Trade Commission v. Simplicity Pattern Co., 360 U.S. 55, 65, 79 S.Ct. 1005, 3 L.Ed.2d 1079; Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 231 F.2d 356, 367-368, c.d. 350 U.S. 991, 76 S.Ct. 545; A. E. Staley Mfg. Co. v. Federal Trade Commission, 7 Cir., 135 F.2d 453, 455; American Oil Company v. F. T. C., 7 Cir., 325 F.2d 101, 104, c.d. 377 U.S. 954, 84 S.Ct. 1631; See also, Mid-South Distributors v. F. T. C., 5 Cir., 287 F.2d 512, 517, c.d. 368 U.S. 838, 82 S.Ct. 36, 7 L.Ed.2d 39
 In Federal Trade Commission v. Simplicity Pattern Co., supra, the court said, in referring to the proof required to make a prima facie case under §§ 2(c), 2(d) and 2(e): "Unlike § 2(a), none of them requires, as proof of a prima facie violation, a showing that the illicit practice has had an injurious or destructive effect on competition." (Italics ours.)
 Of course, the defendant has the burden of proving the affirmative defenses provided for in the Act.
 Mid-South Distributors v. F. T. C., 5 Cir., 287 F.2d 512, 517 (note 9), c.d. 368 U.S. 838, 82 S.Ct. 36; Federal Trade Commission v. A. E. Staley Manufacturing Co., 324 U.S. 746, 759-760, 65 S.Ct. 971, 89 L.Ed. 1338; Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 44-45, 68 S.Ct. 822; United States v. Borden Co., 370 U.S. 460, 467, 82 S.Ct. 1309, 8 L.Ed.2d 627; Federal Trade Commission v. Sun Oil Co., 371 U.S. 505, 514, 83 S.Ct. 358, 9 L.Ed.2d 466.
 
 
 [27]
 See also, Anheuser-Busch, Inc. v. F. T. C., 7 Cir., 289 F.2d 835, 840; Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 248-249, 71 S.Ct. 240, 95 L.Ed. 239
 
 
 [28]
 Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, 248-249, 71 S.Ct. 240; Balian Ice Cream Co. v. Arden Farms Co., 9 Cir., 231 F.2d 356, 367-368, c.d. 350 U.S. 991, 76 S.Ct. 545
 In Standard Oil Co. v. Federal Trade Commission, 340 U.S. 231, at 248, 71 S.Ct. 240, at 249 the court said:
 "The heart of our national economic policy long has been faith in the value of competition. In the Sherman and Clayton Acts, as well as in the Robinson-Patman Act, `Congress was dealing with competition, which it sought to protect, and monopoly, which it sought to prevent.' A. E. Staley Mfg. Co. v. Federal Trade Comm'n, 135 F.2d 453, 455. We need not now reconcile, in its entirety, the economic theory which underlies the Robinson-Patman Act with that of the Sherman and Clayton Acts. It is enough to say that Congress did not seek by the Robinson-Patman Act either to abolish competition or so radically to curtail it that a seller would have no substantial right of self-defense against a price raid by a competitor. * * *"
 
 
 [29]
 American Oil Company v. F. T. C., 7 Cir., 325 F.2d 101, 106, c.d. 377 U.S. 954, 84 S.Ct. 1631; The Borden Company v. F. T. C., 7 Cir., 339 F.2d 953, 957; Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 357, 42 S.Ct. 360; Whitaker Cable Corporation v. Federal Trade Com'n, 7 Cir., 239 F.2d 253, 256, c.d. 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761; Minneapolis-Honeywell Reg. Co. v. Federal Trade Com'n, 7 Cir., 191 F.2d 786, 790, certiorari granted 342 U.S. 940, 72 S.Ct. 552, 96 L.Ed. 699, dismissed 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245
 
 
 [30]
 Record does not show Pet's 1962 volume
 
 
 [31]
 The instant case is clearly distinguishable from Continental Ore Co. v. Union Carbide Corp., 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777. There, the claim was based on an alleged violation of §§ 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2). No § 2(a) claim was asserted. There, the evidence was adequate to support a jury finding that respondents (defendants below) committed the alleged violations of the Sherman Act and that the specific acts charged to have been done by respondents were performed as a part of a basic plan to monopolize the vanadium market and that the plaintiff had suffered an injury and loss. The question was one of causation
 Here, the evidence wholly failed to establish one of the two essential elements of a § 2(a) violation charged against Pet, which Utah Pie was required to prove, namely, that the effect of the price differences had substantially lessened competition, or tended to create a monopoly, or to injure, destroy, or prevent competition with Pet, or that the price differences were likely to do so in the future. Utah Pie suffered no competitive injury.
 Since evidentiary support of a § 2(a) violation was wholly lacking, an essential element for the application of the rule that where the plaintiff proves a loss and an anti-trust violation by the defendant of a nature likely to cause that type of loss, the jury may infer that a causal relation exists, was also lacking. (See Continental Ore Co. v. Union Carbide Corp., supra, p. 697, 82 S.Ct. 1404.)
 What we have here said as to Pet applies equally, as we will hereafter further show, to Continental and Carnation.
 
 
 [32]
 Weade v. Dichmann, Wright & Pugh, Inc., 337 U.S. 801, 808, 69 S.Ct. 1326, 93 L.Ed. 1704; Prairie Band of Pottawatomie Tribe of Indians v. Puckee, 10 Cir., 321 F.2d 767, 770-771; Trafford v. Yellow Cab Co., 3 Cir., 293 F.2d 43; National Equipment Rental Ltd. v. Stanley, 2 Cir., 283 F.2d 600, 603; Gilby v. Travelers Insurance Co., 8 Cir., 248 F.2d 794, 797; In re Linda Coal & Supply Co., 3 Cir., 255 F.2d 653, 656-657
 
 
 [33]
 Moore's Federal Practice, 2nd Ed., Vol. 5, § 50.08; Mutual Ben. Health & Accident Ass'n. v. Thomas, 8 Cir., 123 F.2d 353, 355; Aetna Casualty and Surety Co. v. Yeatts, 4 Cir., 122 F.2d 350, 352; Dickerson v. Franklin Nat. Ins. Co. of New York, N.Y., 4 Cir., 130 F.2d 35, 37; Fleming v. Lawson, 10 Cir., 240 F. 2d 119, 120-121; Roberts v. Sawyer, 10 Cir., 252 F.2d 286; Brown v. Poland, 10 Cir., 325 F.2d 984, 985-986